# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560

---

| | |
|---|---|
| Appellate Court Caption | LARRY W. HOLLAND, Plaintiff-Appellee, v. SCHWAN'S HOME SERVICE, INC., Defendant-Appellant (The Schwan Food Company, Schwan's Shared Services, LLC, and Gary Young, Defendants). |
| District & No. | Fifth District<br>Docket No. 5-11-0560 |
| Filed<br>Rehearing denied | May 30, 2013<br>July 1, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a back injury claimant suffered at work, the evidence supported the jury's finding that claimant was terminated from his position in retaliation for exercising his rights under the Workers' Compensation Act and the award for compensatory and punitive damages was upheld. |
| Decision Under Review | Appeal from the Circuit Court of Franklin County, No. 09-L-56; the Hon. E. Kyle Vantrease, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael F. Dahlen, of Feirich/Mager/Green/Ryan, of Carbondale, Robert E. Arroyo, of Jackson Lewis LLP, of Chicago, and Alan L. Rupe and Richard A. Olmstead, both of Kutak Rock LLP, of Wichita, Kansas, for appellant.

Thomas F. Crosby, of Winters, Brewster, Crosby & Schafer, LLC, of Marion, for appellee.

Panel

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justice Goldenhersh concurred in the judgment and opinion.
Presiding Justice Spomer dissented, with opinion.

**OPINION**

¶ 1     This case involves a lawsuit filed by the plaintiff, Larry W. Holland, alleging that his former employer, Schwan's Home Service, Inc. (Schwan's), terminated his employment in retaliation for his exercising his rights under the Illinois Workers' Compensation Act (the Act) (820 ILCS 305/1 to 30 (West 2008)). After a seven-day trial, a jury returned a verdict in Holland's favor on his retaliatory discharge claim, awarding him a total of $4,260,400 in compensatory and punitive damages. The punitive damages portion of the award was $3.6 million.

¶ 2     Throughout the trial court proceedings, Schwan's denied Holland's assertion that it terminated his employment. Instead, it maintained that when Holland recovered from his work accident and was ready to return to work, it offered him an available position at the facility where he previously worked, but he refused to report for work. At several stages of the lower court proceedings, Schwan's requested the circuit court to decide the issue of whether it had terminated Holland in its favor as a matter of law, rather than submitting the issue for the jury to decide. Prior to the trial, Schwan's made this request in a motion for summary judgment that the circuit court denied. After the conclusion of Holland's case in chief, it made the request again in a motion for a directed verdict. Again, the circuit court denied the motion. In denying Schwan's motion for a directed verdict, the circuit court found that Holland had presented sufficient evidence for the jury to conclude that he was terminated. It noted that Schwan's was "free to argue to the jury" that Holland was not terminated, but it was "up to the finder of fact to make that determination." Finally, after the jury considered the evidence and entered a verdict in Holland's favor, Schwan's raised this issue again in a posttrial motion requesting the circuit court to enter a judgment notwithstanding the jury's verdict (judgment *n.o.v.*). The circuit court again denied Schwan's request.

¶ 3        Schwan's now appeals the judgment entered on the jury's verdict and argues that the circuit court should have entered a judgment *n.o.v.* in its favor because the evidence conclusively established that it did not terminate Holland's employment. Schwan's also advances alternative arguments under a judicial estoppel theory and a standing theory and takes issue with the circuit court's jury instructions, certain evidentiary rulings, and the amount of the jury's award for compensatory and punitive damages. For the following reasons, we affirm.

¶ 4                                           BACKGROUND

¶ 5        The legislature enacted the Workers' Compensation Act as a compromise between employers and employees with respect to compensation for work-related injuries. Under the statutory scheme, employees gave up their common law right to sue their employers in tort, but gained the right to recover for injuries arising out of and in the course of their employment without regard to fault. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 180, 384 N.E.2d 353, 356 (1978). Employers gave up their common law defenses to claims involving work-related accidental injuries or death, but their liability became fixed under the statutory scheme. *Id.* The ability of this statutory scheme to provide efficient and expeditious remedies for injured workers would be seriously undermined if employers could simply terminate or threaten to terminate employees for seeking their rights and remedies under the statute. *Id.* at 181, 384 N.E.2d at 357. "[W]hen faced with such a dilemma many employees, whose common law rights have been supplanted by the [Workers' Compensation] Act, would choose to retain their jobs, and thus, in effect, would be left without a remedy either common law or statutory." *Id.* at 182, 384 N.E.2d at 357.

¶ 6        In 1975, the legislature amended the Workers' Compensation Act to include section 4(h), which expressly prohibits an employer from discharging an employee because the employee exercises his rights or remedies granted to him under the Act. Pub. Act 79-79, § 1 (eff. July 1, 1975). In the present case, in order for Holland to succeed in his claim against Schwan's for retaliatory discharge, he had to prove to the jury that he was an employee before his injury, that he exercised a right granted by the Workers' Compensation Act, that he was discharged by Schwan's, and that his discharge was causally related to his filing a claim under the Workers' Compensation Act. *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 335-36, 704 N.E.2d 403, 406 (1998). As noted above, Schwan's takes issue with the jury's finding that Holland proved that it discharged him from his employment.

¶ 7        Schwan's challenge to the "discharge" element of Holland's claim is presented to us on appeal by way of Schwan's argument that the circuit court erred in denying its motion for a directed verdict and/or its motion for a judgment *n.o.v.* "Although motions for directed verdicts and motions for judgments *n.o.v.* are made at different times, they raise the same questions and are governed by the same rules of law." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37, 983 N.E.2d 414. Our review of the circuit court's denial of Schwan's request for a judgment *n.o.v.* requires us to consider all of the evidence and reasonable inferences in the light most favorable to Holland to determine whether there was a total failure or lack of evidence to prove the discharge element of his claim. *Id.* This

standard is a high one. *Id.* Accordingly, in discussing the background relevant to Schwan's contention on appeal, we look at the trial evidence in the light most favorable to Holland and with all reasonable inferences construed in his favor on the issue of whether Schwan's terminated his employment. If reasonable minds differ concerning inferences or conclusions to be drawn from the evidence, entry of a judgment *n.o.v.* is not appropriate. *Id.*

¶ 8        Schwan's is in the business of marketing and distributing a variety of frozen food products to consumers for home consumption. Holland began working for Schwan's on July 12, 2004, as a "district project manager." However, he held that position for only two months before Schwan's discontinued this position. Schwan's then offered Holland a position as a "sales supervisor." As part of his duties as a sales supervisor, Schwan's trained Holland in its employment procedures. Holland explained to the jury that, for job transfers within the company, Schwan's employment procedures included a website that employees could log onto using their employee number. Once logged on, an employee was able to review any internal offers extended to employees for job reassignments. The information available on the website included a written internal offer, the compensation package, vacation benefits, and other information related to the new position being offered. According to Holland, a written "internal offer" was the customary way Schwan's internally moved its employees from one position to another. When Schwan's eliminated Holland's district project manager position in 2004, it notified him of his transfer offer to the sales supervisor position by issuing him a written internal offer.

¶ 9        Holland worked for Schwan's as a sales manager until July 2006, when Schwan's discontinued that position. Schwan's then offered Holland the position of "facility supervisor" at its depot in West Frankfort, Illinois. This was the position that Holland occupied when he was involved in his work-related accident that occurred in August 2008. Again, when Schwan's transferred Holland to this new position, it issued him another written internal offer. The written "Internal Offer Letter" was admitted into evidence at the trial, and it included a summary of the offer's terms and conditions and a line for Holland to sign as his acceptance of the offer. Holland indicated that he was familiar with "all the different parts" of Schwan's internal offer letters because they were the customary way that Schwan's moved someone from one position to another and because his reassignment in July 2006 was the second time he had received a written internal offer letter from Schwan's. He also testified that he continued to receive a salary from Schwan's during his transition from sales supervisor to facility supervisor.

¶ 10        Holland's duties as the facility supervisor at the West Frankfort depot included managing the facility, maintaining inventory, managing the movement of goods in and out of the facility, and managing and helping the employees (material handlers) who physically handled and moved the goods in and out of the facility. He was responsible for keeping track of inventory, both stored in the depot's storage freezer and loaded onto the depot's delivery trucks. In managing inventory, he was responsible for controlling the amount of goods that inexplicably disappeared from the depot's inventory (shrinkage) and the amount of goods that could not be sold to consumers because of defects (damage). He was also responsible for the maintenance of the depot property and delivery trucks. At the end of his workday, he was responsible for mowing the depot's yard if necessary, mopping floors, and emptying

trash. Holland worked at night. Typically, he arrived at work at 11 p.m. and worked until his daily tasks were completed, sometimes until 8 a.m. and many times past 10 a.m.

¶ 11    During his time as the facility supervisor at the West Frankfort depot, he managed two material handlers who also worked at the depot, Tom Pietrantoni and Chris Owens. The two material handlers worked at night along with Holland and were involved with unloading products from semitrucks into the depot's storage freezer, inventorying the products in the freezer, loading products from the storage freezer onto the delivery trucks, and inventorying the products on the delivery trucks. As the facility supervisor, Holland's job duties required him to perform all of the same functions that the material handlers performed, working with them side by side, including unloading and loading trucks and handling products in the freezer.

¶ 12    When Holland began working as the facility supervisor for the West Frankfort depot, his immediate supervisor was Mick Heggaton. Heggaton was employed by Schwan's as the "location general manager" of the West Frankfort, Illinois, depot. The location general manager's duties included overseeing sales and making sure that the depot was running smoothly. The location general manager (Heggaton) and facility supervisor (Holland) both reported to Schwan's district general manager, Steven Wolfenbarger. As a district general manager, Wolfenbarger was in charge of overseeing sales and operations in a district that encompassed parts of Illinois and Indiana, including the West Frankfort depot. A regional operations manager, Doug Crider, was responsible for operational decisions and profit decisions within a geographic region that included the West Frankfort depot. Crider's authority included decisions concerning how many employees could be employed at the West Frankfort depot and how many hours the employees could work.

¶ 13    After the end of each year, the location general manager was responsible for conducting an evaluation of the facility supervisor's job performance for the year. Schwan's yearly evaluation form included ratings for specific performance factors and an overall performance rating. The rating choices for each performance factor and for the employee's overall performance were one of four options: (1) exceeds expectations, (2) meets expectations, (3) some improvement required, or (4) does not meet expectations. In addition, the evaluation forms contained an area for the employee to write his own comments.

¶ 14    According to Holland, the yearly performance evaluation had to be completed before the end of March of the following year. Prior to the evaluation, the employee had to submit a self-critique sheet to his supervisor. The employee submitted the self-critique sheet by mid-February. The supervisor then filled out the evaluation form, went over the previous year's goals and performance with the employee, and established performance goals and objectives for the upcoming year.

¶ 15    For 2006, Heggaton rated Holland's overall performance as "some improvement required." Heggaton noted in the report that Holland assumed the facility supervisor position in July 2006 and was developing at an acceptable pace, but still needed to improve in some areas, including the development of his workforce into a more organized team. Holland did not write any comments in the employee comment section of the 2006 evaluation. He testified, "We both understood that there was no way I was going to be able to convert Mr.

Owens, so there was no reason to make any comment." The 2006 evaluation was signed and dated by Heggaton and Holland on March 6, 2007.

¶ 16    Early in 2008, prior to the completion of the 2007 yearly evaluation, the location general manager at the West Frankfort facility changed from Heggaton to Ryan Underwood. In March 2008, Underwood completed Holland's yearly evaluation for 2007. Underwood and Holland signed the 2007 evaluation on March 13, 2008. Underwood rated Holland's overall performance in 2007 as "some improvement needed." In the employee comments section, Holland noted that the evaluation was based on four months of observation and that he had not been formally trained for his position, but had plans in place to get on-the-job training from an experienced facility supervisor. At the time of the annual review, Schwan's presented him with two awards for his performance in 2007: one for meeting his goals in managing inventory (damage and shrinkage) and another for meeting his goals for labor hours. Also, effective March 2, 2008, Schwan's awarded Holland a 2% raise in his salary.

¶ 17    On Friday, August 22, 2008, Holland and the material handlers, Pietrantoni and Owens, were in the process of unloading goods from a semitruck into the depot's freezer when Holland slipped on some ice and fell on his back. He continued to work and finished the shift. Initially, he did not seek any medical attention. He hoped to make it through the weekend without any problems. However, on Monday, August 25, 2008, he decided that he needed to seek medical attention.

¶ 18    Dr. Lueking examined Holland's back, diagnosed his back injury, and suspected a possible ruptured disc. Dr. Lueking concluded that Holland could return to work with the following restrictions on his work duties: "no heavy lifting, no prolonged standing and should be on light duty only with minimal driving."

¶ 19    At the time of Holland's accident, a company called Schwan's Shared Services, LLC (Shared Services), provided Schwan's with a number of management services, including workers' compensation specialists who managed Schwan's workers' compensation claims. The workers' compensation specialists' duties included coordinating with Schwan's workers' compensation insurance carrier, Hartford Insurance Company (Hartford), and with Hartford's third-party administrator, Specialty Risk Services (SRS). SRS administered workers' compensation claims on behalf of Hartford.

¶ 20    On August 25, 2008, one of Shared Services' workers' compensation specialists, Eva Bruns, opened a "leave of absence" file to document actions and communications concerning Holland's work-related injuries, treatments, and workers' compensation benefits. Bruns did not testify at the trial, but her notes that she made in the leave-of-absence file were admitted into evidence. When Bruns opened the leave-of-absence file on Holland's injury, she noted Holland's work restrictions in the file. Testimony at the trial indicated that Holland's work restrictions were coordinated between the workers' compensation specialist and the location general manager and that it was their responsibility to see that Holland worked within his restrictions.

¶ 21    Schwan's claims that, beginning on August 25, 2008, it placed Holland in its "temporary alternative duty" (TAD) program. The purpose of Schwan's TAD program is to provide injured workers with temporary job duties within their medical restrictions if such work is

available. Typically, Schwan's allowed an employee to be in the TAD program for 90 days, but it also allowed extensions depending on the employee's situation, including whether he was improving or close to returning to full duty.

¶ 22    As long as the employee continued to work through the TAD program, Schwan's would not discharge the employee because he could not perform full job duties. The Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 (2006)) also provided Holland with up to 12 weeks of unpaid leave of absence for medical reasons. Schwan's, however, determined that it could begin running the clock on Holland's FMLA protection while he was on light duty. Therefore, once Schwan's placed Holland in its TAD program, it began to run the clock on the 12-week leave that he was entitled to under FMLA.

¶ 23    When Holland discussed his work restrictions with his supervisor, Ryan Underwood, Underwood told him, "that is fine, as long as the job gets done." Under Schwan's TAD program, it was the responsibility of the location general manager on duty to make sure that the duties assigned to an injured facility supervisor did not exceed his job restrictions. One of Shared Services' workers' compensation specialists testified at the trial, "Our managers know that they need to keep their employees within those restrictions."

¶ 24    Even though Holland was placed in Schwan's TAD program, Underwood did not take any action to modify Holland's job duties and did not take over any of his duties that fell outside his work restrictions. Although he was supposed to be in the TAD program, Holland's job duties did not change; he had to complete all of the same tasks that he did before the accident. The duties included working side by side with the material handlers, lifting items over 25 pounds when loading delivery trucks and moving goods in the freezer, hanging with one hand on a delivery truck's side rails while loading goods, and rearranging goods onto 15 delivery trucks. In addition, Holland endured prolonged standing, bending, and twisting during the loading and unloading of goods, when refueling the delivery trucks, and while inventorying the delivery trucks. These were all activities that fell outside Holland's light-duty work restrictions. Holland testified that the facility supervisor position involved only a small amount of managerial work that was performed in front of a computer in a sitting position.

¶ 25    In September 2008, Holland followed up with his treating physician, and his doctor continued the previous light-duty restrictions. On September 19, 2008, his doctor referred him to a neurosurgeon. In the doctor's slip dated September 19, 2008, the doctor wrote that Holland's light-duty restrictions should continue "for the next 30 days." On October 17, 2008, his treating physician continued the light-duty restrictions with additional restrictions that included no lifting greater than five pounds and no prolonged exposure to cold temperatures.

¶ 26    Each time Holland received new restrictions from a doctor, he presented the written restrictions to his immediate supervisor and faxed a copy to the workers' compensation specialist handling his case. However, at this point, no one within Schwan's organization modified Holland's job duties to comply with the restrictions or offered him extra help so that he did not have to perform the duties outside his work restrictions. He continued to perform all of the same duties he was required to perform prior to the accident.

¶ 27    As Holland continued to perform job duties outside his work restrictions, his back condition and symptoms became worse, and he began experiencing numbness in his legs. On December 1, 2008, Holland was examined by a neurosurgeon, Dr. Vaught, who diagnosed Holland as having strained his back muscles and suffering from a bulging disc. Dr. Vaught's job restrictions for Holland at that time included restricting him from lifting over 25 pounds and from performing repetitive bending, stooping, and kneeling. In addition, Dr. Vaught prescribed physical therapy.

¶ 28    Again, Holland presented Dr. Vaught's new restrictions to his supervisor, Underwood, and complained to Underwood that the condition of his low back was becoming severe. He explained that he was having a particularly hard time working in the freezer because of the amount of weight that had to be lifted while working in the freezer. In addition, he explained that the temperature in the freezer caused him to shiver which, in turn, caused his back muscles to tense up and aggravate his back injury.

¶ 29    In mid-December, Underwood finally began relieving Holland, but only by assisting the material handlers, Pietrantoni and Owens, with unloading goods from semitrucks into the depot's freezer when semitruck deliveries arrived at the depot. Semitruck deliveries arrived, on average, every eighth day. Holland had to continue performing all of the other tasks required of a facility supervisor, including all of the other activities that involved repetitive bending, twisting, prolonged standing, and lifting over 25 pounds. As a result, Holland's work-related back injury did not get any better after Underwood began helping on the days the semitrucks made deliveries. Also in mid-December, Holland called Bruns for authorization for the physical therapy that Dr. Vaught had prescribed, but he did not receive an immediate authorization for the physical therapy. Therefore, no physical therapy appointments were made at that time.

¶ 30    Near the end of December 2008, Schwan's district general manager, Wolfenbarger, had determined that Underwood was unable to perform the duties of the location general manager at the West Frankfort depot. Accordingly, Wolfenbarger removed Underwood from that position and reassigned him to a new position as a Schwan's route salesman in Indiana. There was no time gap between Underwood's reassignment of positions. As soon as Wolfenbarger removed Underwood from the location general manager position, Underwood immediately began his new position as a route salesman.

¶ 31    In January 2009, Wolfenbarger assigned Gary Young to serve as the location general manager at the West Frankfort facility. Young testified that when Wolfenbarger assigned him to the West Frankfort facility, he did not mention any issues with respect to Holland's job performance. After Young began working as the location general manager at the West Frankfort facility, Holland's duties did not change. He informed Young of his job restrictions and that Underwood had been helping with the unloading of semitrucks. When he arrived, Young also began helping with the unloading of semitrucks on delivery days, but Holland had to continue performing all of the other duties of a facility supervisor. Young testified that he helped unload semitrucks on delivery days the entire time Holland was the facility supervisor.

¶ 32    At the trial, Young acknowledged that it was his responsibility to see that Holland was

not assigned duties outside his medical restrictions. However, he testified that he was not present at the depot at night when Holland worked to ensure that he did not exceed the restrictions. He also testified that one of the material handlers, Owens, was injured in January and in February, and Schwan's had to hire temporary help. Holland testified that Schwan's did not approve any extra help at the depot until two weeks after Owens went on light duty.

¶ 33    By mid-January, Holland still had not received the authorization that he requested from Bruns for him to attend physical therapy. Around January 14, 2009, Holland received a telephone call from Joan Kantor, who was the SRS workers' compensation adjuster who was handling his claim on behalf of Hartford. Kantor asked Holland about his physical therapy. Holland told Kantor that he had not yet received any authorization for physical therapy. In addition, he informed Kantor that his ability to attend physical therapy was limited at that point in time because, the week before, one of his material handlers, Owens, was injured and was on leave which left only him and Pietrantoni to operate the West Frankfort depot.

¶ 34    When Bruns later learned from Kantor that Holland had not attended any physical therapy, she contacted his treating physician, Dr. Vaught, without Holland's knowledge, and attempted to convince the doctor to release Holland back to work full duty on the basis that he had not followed through with the prescribed physical therapy. Dr. Vaught rejected this request and told Bruns that he would not release Holland to work full duty without conducting a reassessment of his injuries. On January 16, 2009, Bruns sent an e-mail to Holland concerning his failure to attend physical therapy. She told Holland in her e-mail that his failure to attend physical therapy was unacceptable and that he should follow up with his doctor "ASAP."

¶ 35    Holland responded to Bruns's e-mail on the same day. He told Bruns that he would follow up with his doctor right away, but that his work and home life did not leave time for physical therapy. He noted that he was down to one material handler and that he would not be getting any help "during the regular load week, just the semi, while he is gone." He believed that Pietrantoni would quit if he was left to handle all of the duties by himself in order to accommodate Holland's physical therapy. Holland also wrote, "Doing my job and supporting my coworkers and the drivers here is very important to me and that is why I have continued to work during this injury." He added, "if you have another solution, I would be happy to implement it."

¶ 36    Bruns did not respond with "another solution" to accommodate physical therapy. Instead, the district general manager, Wolfenbarger, sent Holland and Bruns an e-mail that same day wanting to know what physical therapy appointments Holland had missed. He expressly questioned whether Owens' injury could have caused Holland to miss any physical therapy appointments. In the e-mail, Wolfenbarger told Bruns to "[c]heck the date and time of the appointment and correspond it with the [material handler's] injury." Wolfenbarger concluded his e-mail by chastising Holland as follows: "Missing [physical therapy appointments] that are usually scheduled after 8:00 a.m. should never be blamed on work hours that do not interfere."

¶ 37    Holland, however, explained to the jury that he had not missed any physical therapy appointments. Because physical therapy had not been authorized, no physical therapy

appointments had been made. In addition, Holland disagreed with Wolfenbarger's statement that his work was irrelevant because physical therapy appointments were usually after 8 a.m. He explained to the jury that when he got off work, usually after 10 a.m., he was responsible for taking care of his son the rest of the day and later had to pick up his daughter from grade school. He was not able to sleep until his wife got home from work around 5:30 p.m. or 6:30 p.m.

¶ 38    On January 26, 2009, Holland followed up with Dr. Vaught, and he apparently agreed that Holland's work schedule was relevant to his physical therapy. Dr. Vaught modified Holland's job restrictions so that he was not to work more than six hours on the days he had physical therapy appointments. Dr. Vaught wanted the claimant to be home by 5 a.m. on the days that he had physical therapy so he could get some sleep before his appointments. Dr. Vaught also prescribed an injection, a left L4-L5 facet block, for Holland's back pain.

¶ 39    Holland testified that immediately after the January 26, 2009, appointment with Dr. Vaught, he set up appointments for the physical therapy and the injections. However, when he discussed Dr. Vaught's modifications of his job restrictions, Young did not agree to any change in his work schedule to accommodate his physical therapy appointments.

¶ 40    The day after Holland's follow up appointment with Dr. Vaught, January 27, 2009, Bruns noted the new work restrictions in Holland's leave-of-absence file, and she contacted Kantor over the telephone. In her file, Kantor noted the telephone call from Bruns as follows: "Rcvd call from eva, she just rcvd note from [physician's assistant] at dr ofc, that gives ee even more restrictions than he had before, saying he can only work 6 hours on days he has pt. restricts lifting etc. it is time for [an independent medical examination]. ee has been on [light duty] for over 150 days & he knows his head is on the chopping block." Bruns also sent an e-mail to Young outlining Holland's new work restrictions.

¶ 41    That same day, January 27, 2009, Wolfenbarger contacted one of Schwan's human resource generalists, Daryl Overstreet, to find out whether Holland had exhausted his FMLA leave. As a result of his conversation, Overstreet sent an e-mail to Schwan's leave-of-absence administrator, Connie Litchtsinn, asking her if she could verify if Holland had "exhausted his FMLA." Overstreet added, "Wolfenbarger has a similar situation with Chad Otto, [and] wishes to replace [Holland] if possible." At the trial, Wolfenbarger testified that Chad Otto was an employee in Indiana who had hurt his shoulder in an accident that was unrelated to work and was on medical leave. Young testified that he had no knowledge of Wolfenbarger's inquiries to Overstreet on January 27 or that they were otherwise discussing Holland in January 2009.

¶ 42    Because Litchtsinn only managed leaves of absence that were unrelated to occupational injuries, she directed Overstreet to ask Bruns about Holland's FMLA leave because he was on "work comp" leave. The next day, Bruns sent an e-mail to Overstreet stating that because Holland's "FMLA ran out last year, we should be OK to replace Mr. Holland's position." She added that an independent medical examination (IME) of Holland was being set up "to address all the issues that seem to prevent his return to work full duty." On January 29, 2009, Kantor sent Holland a letter informing him that she had scheduled an IME to be conducted by Dr. Hayward on February 13, 2009.

¶ 43     On February 5, 2009, the organization that handled FMLA leaves on behalf of Schwan's, The Reed Group, confirmed to Bruns and Overstreet that Holland had exhausted his FMLA leave as of October 26, 2008. On February 6, 2009, The Reed Group then sent out an "exhaustion letter" to inform Holland that his FMLA leave had expired back on October 26, 2008. Upon receiving the confirmation concerning Holland's exhaustion of FMLA leave, Overstreet sent an e-mail to Bruns on February 6, 2009, inquiring whether Holland's IME had been completed "to address the issues preventing his return to full duty."

¶ 44     On the same day, February 6, 2009, Wolfenbarger completed Holland's annual review for 2008. Overstreet could not remember whether he told Wolfenbarger that he had received confirmation that Holland's FMLA leave had been exhausted, and Wolfenbarger denied knowing that Holland's FMLA leave was exhausted when he completed the 2008 annual review. Nonetheless, on February 6, 2009, Bruns notified Young that a letter had been sent out to Holland notifying him that his FMLA leave had been exhausted.

¶ 45     Wolfenbarger testified that he had to fill out Holland's 2008 evaluation because Underwood had been Holland's immediate supervisor for most of 2008, but he was no longer the location general manager of the West Frankfort facility. Holland, however, testified that Wolfenbarger did not have an opportunity to observe his work duties in 2008. In addition, as noted above, previous evaluations were not completed until March and not until the employee had submitted a self-critique sheet to his supervisor. Wolfenbarger not only completed Holland's 2008 evaluation a month early, but he also completed it without giving Holland an opportunity to submit a self-critique sheet.

¶ 46     In his evaluation, Wolfenbarger rated Holland's overall performance at the lowest rating possible: "does not meet expectations." Wolfenbarger did not go over the evaluation with Holland as was the customary practice for end-of-year evaluations. Instead, he sent it to the West Frankfort depot, where Young handed it to Holland for him to sign. Holland signed it on February 11, 2009, the day before he was scheduled to leave for a one-week vacation. He wrote in the employee comment section as follows:

> "I am personally very disappointed in this evaluation particularly those <u>unobserved</u> areas of performance related to People Development, Strategy [and] Planning [and] Quality of work. I have spoken to Gary Young [and] asked him to work with me on a comprehensive plan to improve overall performance [and] meet Company established sales related goals." (Emphasis in original.)

¶ 47     Wolfenbarger initially told the jury that he had prepared the evaluation on February 6, then sat down with Holland at the West Frankfort depot and personally went over the evaluation with him on February 11, when Holland signed it. He later recanted that testimony and admitted that he never met with Holland to go over the evaluation. Instead, Holland met with Young to sign the 2008 evaluation on the morning of February 11 after he worked his shift that night. Young then faxed the signed evaluation to Wolfenbarger, who then signed the faxed copy with Holland's signature. Holland testified that he did not discuss any goals and objectives for 2009 with anyone during this 2008 evaluation process. The area on the 2008 evaluation form for writing 2009 goals and objectives was left blank by Schwan's.

¶ 48     At the trial, Wolfenbarger also denied having knowledge of Holland's workers'

compensation claim at the time he evaluated Holland's 2008 performance. However, as noted above, in January 2009, one month prior to Holland's evaluation, Wolfenbarger had chastised Holland when he mistakenly believed that Holland had missed physical therapy appointments. The record also establishes that on February 9, 2009, the day of Wolfenbarger's evaluation, Bruns informed Young by e-mail that a letter had been sent to Holland to inform him that his FMLA leave had expired.

¶ 49    As noted above, in late January 2009, Kantor sent Holland a letter informing of him of the IME scheduled for February 13, 2009. Holland testified that he was receiving correspondence related to his work accident every couple of days, primarily from SRS. Because of the volume of the correspondence, he lost interest in opening and examining each correspondence and began stacking the unopened letters in a pile. In addition, in early February 2009, during the time that he would have received Kantor's letter, he was preparing to leave town for his vacation. He was scheduled to be off work from February 12 to February 19, 2009. Holland received Kantor's letter concerning the scheduled IME before he left for his vacation, but he put the unopened letter on top of the pile of the other unopened letters. He left for his vacation without knowing that the IME had been scheduled during his vacation. As a result, Holland missed the appointment for the IME.

¶ 50    On the same day of the missed appointment, Bruns, Kantor, Overstreet, Wolfenbarger, and Young all learned that Holland had missed the IME appointment. Overstreet sent an e-mail to Young and Wolfenbarger stating that he wanted to "know asap why [Holland] did not show up for the appointment." On the same day, February 13, Kantor sent a letter to Holland that informed him that all further medical treatments and benefits under his workers' compensation claim were being denied and that Schwan's was no longer required to accommodate any job restrictions imposed by his treating doctor. Overstreet received a copy of the letter. On February 14, Young informed Overstreet and Wolfenbarger that Holland was on vacation as of February 12 and would be back on February 19 but that he should have made appropriate arrangements.

¶ 51    When Holland returned from his vacation, he went through his mail, opened Kantor's February 13, 2009, letter, and learned for the first time that he had missed the IME appointment. He then opened other envelopes that he had received from SRS and discovered Kantor's January 29, 2009, letter informing him of the appointment. Overstreet and Young spoke with Holland over the telephone and learned that there had been a miscommunication between Holland and Kantor. Young told Holland that he was required to come into work and report for full duty or he would have to sign a letter of resignation. Holland advised Young of the status of his medical treatments and told him that he was not going to risk further injury to his back.

¶ 52    Holland called Bruns Monday morning, February 23, 2009, and explained to her why he had missed the appointment. Bruns directed Holland to speak with Kantor to see if his IME could be rescheduled. At that time, his scheduled injections prescribed by Dr. Vaught were canceled because Kantor's letter informed him that no further medical benefits would be covered under his workers' compensation claim. On February 24, 2009, Kantor told Holland that she would reschedule his IME and would authorize his injections but that Schwan's did not have to accommodate his work restrictions.

¶ 53 On March 2, 2009, Bonita Skuya replaced Bruns as the Shared Services' workers' compensation specialist handling Holland's claim.

¶ 54 The IME was rescheduled for March 9, 2009, and Holland attempted to go to the IME on that day, but the appointment had to be rescheduled again to March 17, 2009, because the IME doctor had a family emergency. On March 20, 2009, Skuya received the report from the IME. Schwan's IME doctor agreed with Holland's treating physicians and believed that all of the recommended treatments were appropriate. He believed that both epidural steroid injections and physical therapy were necessary for treatment of Holland's work-related injury. In answering the question of whether Holland could return to work full duty, the IME doctor increased his job restrictions by restricting him from lifting anything over 15 pounds. Although the doctor said he could work in a cold environment, he continued the restrictions of no repetitive bending, stooping, and twisting. He believed that Holland would be able to return to full duty on the completion of the injections and the physical therapy.

¶ 55 Skuya forwarded the new restrictions to Young and Wolfenbarger in an e-mail dated March 23, 2009. Skuya wrote in her e-mail that, in her opinion, since Holland had said his work schedule was interfering with his ability to complete physical therapy, perhaps they should consider taking him totally off of work until he completed his therapy. She asked Young to advise on whether he agreed or whether they should allow Holland another 30 days in the TAD program. Young told Skuya not to take Holland off work because he needed the help and to extend Holland's TAD program another 30 days.

¶ 56 On March 24, 2009, Skuya sent a letter to Holland notifying him that, in light of the IME, Schwan's had granted him one final 30-day extension in the TAD program which would end on April 24, 2009. Skuya sent a copy of the letter to Kantor in an e-mail dated March 24, 2009. In her e-mail, Skuya wrote as follows: "I understand we cannot terminate him, just using this as a way to let him know he cannot continue along his same path." On March 31, 2009, after receiving her letter, Holland e-mailed Skuya because he had a question whether an L4-L5 facet block had been approved or whether an epidural steroid injection had been approved. He informed Skuya that his next doctor's appointment was scheduled for April 2, 2009.

¶ 57 On April 1, 2009, Skuya again e-mailed Kantor and reiterated that she had advised Holland that he had until April 21, 2009, to complete his physical therapy and return to work full time. Skuya asked Kantor in her e-mail, "How many times does he get to postpone this treatment before we say enough is enough?" Kantor responded that he was having his injection on April 2 and was to confirm where he was going to perform his physical therapy. She added: "If he continues to be non-compliant with the pt recommended both by his [treating doctor] and our ime [doctor], then we can try to deny further [treatment]. This is an Illinois claim & if he gets an atty, we will have a continued fight on our hands, but it will be his own fault."

¶ 58 Holland subsequently received his first epidural steroid injection on April 9, 2009, and received the second two weeks later. In addition, he started his physical therapy, which was scheduled to last through April 2009. Throughout April 2009, Holland did not miss any of his scheduled physical therapy appointments, and he complied with all of his treatment

requirements. Skuya testified that she had no concerns about Holland's compliance with his treatment in April 2009, and she believed that the doctor would release Holland back to full duty on April 28, 2009. During this period of time, however, Schwan's required Holland to continue working beyond his medical restrictions even though it claimed to have put him in its TAD program.

¶ 59    Holland saw his treating physician on April 28, 2009. Instead of releasing Holland to full duty, the doctor took him completely off work until May 19, 2009, so that he could receive more aggressive physical therapy. The doctor believed that Holland was not healing, and the doctor was concerned that he was not able to sleep without medication. The treating physician's new restrictions were not well received by Schwan's.

¶ 60    Holland sent a text message to Young to inform him of the doctor's new restrictions, and Young e-mailed the new restrictions to Skuya. Wolfenbarger was copied in on Young's e-mail to Skuya, and Young asked in the e-mail: "Our [*sic*] we going to now ask him to step aside from Facility Supervisor or not?" The next day, Skuya sent a response e-mail to Young and copied Wolfenbarger and Overstreet in on the e-mail. She advised Young that if he chose to replace Holland, he should work with Overstreet. She also advised Overstreet that since Holland had exhausted his FMLA protection, they were "safe to replace him." She concluded, "I find it extremely interesting that he has been taken completely off of work, when we were anticipating full duty release."

¶ 61    The next day, Skuya sent Kantor an e-mail in which she stated: "[M]y gut tells me to do some surveillance on him. What do you think?" In addition, Overstreet e-mailed Skuya that stated, "I am most certain from earlier conversations with [Young] that given the circumstances, he will probably wish to replace [Holland]." He asked Skuya, "Since you indicated [Holland] has exhausted his FMLA, if [Young] were to replace him, is this a situation where upon full duty release he could be offered whatever [Young] has available & have the option of securing another position within the company within 30 days?" In her response e-mail, Skuya wrote: "You are correct. If he is replaced as FS, he will be offered whatever position is available when he is returned back to full duty work." She speculated that Holland probably "knew it was coming" which was why "he is suddenly unable to work in any capacity."

¶ 62    On April 30, 2009, Kantor faxed the physician's restrictions to Skuya. The physician believed that Holland could return to full duty at the end of the aggressive physical therapy. Skuya forwarded the doctor's report to Young and Overstreet. Young sent the following response to Skuya and copied Wolfenbarger on his response: "The problem here is reliability. He has been playing this game for quite some time. I am looking for a long-term solution to this problem, not a short-term wait and see. Please advise." Skuya responded as follows: "I know you have been patiently waiting for him to recover. I would recommend you move forward doing what's best for your business." Young then forwarded Skuya's e-mail to Overstreet and Wolfenbarger and recommended that they remove Holland as the facility supervisor. Overstreet responded that because Holland had exhausted his FMLA, he agreed with Skuya to replace Holland as the facility supervisor based on business needs.

¶ 63    Skuya e-mailed Overstreet on April 30, 2009, and told him that she did not have the

authority to change an employee's status, but that was something that Young would have to work out with payroll. She stated that the person taking over the position should be given the facility supervisor title and that Holland would then be changed to an "MH title."

¶ 64    In preparing the letter to send to Holland to notify him that his position was being reassigned to someone else, on May 7, 2009, Overstreet e-mailed Skuya and asked if the 30-day period that Holland had "to apply for another position would normally begin from the date he went out again for physical therapy, or the date he's able to return when physical therapy was completed, or the date we made the decision to reassign his position." Skuya responded that, in her opinion, they could not start the 30 days until he is capable of applying for and receiving a new position. Therefore, the 30 days should begin to run when he is released to return to full-duty work. At the trial, Skuya explained that if the 30 days began to run before he was off of work restrictions, that would lessen his chances of obtaining another job.

¶ 65    Overstreet e-mailed Skuya again on May 11, 2009, asking her the tentative date on which the 30-day period would begin to run. On May 12, 2009, Skuya e-mailed Overstreet that it would be hard to determine an appropriate date for full-duty release to return to work. She said that she would notify him when Holland was released to full-duty work so he could begin his notification process.

¶ 66    On May 15, 2009, Kantor requested authority from Skuya to increase the reserve amount necessary for handling Holland's claim. Because Holland's doctor had taken him off work for aggressive physical therapy, Schwan's was required to begin paying him temporary total disability (TTD) benefits. Kantor noted in her e-mail to Skuya, "since you have asked him to step aside as facility supervisor, I do anticipate he will retain an attorney." Skuya initially approved the reserve increase. However, on May 18, 2009, Skuya e-mailed Kantor that she had confirmed that Holland was entitled to 120 days of salary continuation while he was in physical therapy. Therefore, Skuya wrote, even though he was not working, he would be receiving his full salary until August 29, 2009. According to Skuya, the TTD check issued on May 15 would be an overpayment, and she asked Kantor if she could put a stop-payment on the check. In response, Kantor said that she informed Holland that he would receive a salary continuation and asked him to void the TTD benefit check from SRS. Holland voided the check as Kantor asked him to do. However, he never received a salary continuation through August 2009 and never received any TTD benefits when he was off work for the aggressive physical therapy program.

¶ 67    A note from Holland's physician dated May 19, 2009, stated that he was doing very well and that he would be ready to return to work full duty on Monday, May 25, 2009.

¶ 68    On May 19, 2009, Skuya sent Kantor an e-mail as follows: "Get ready for a battle. His position has been reassigned, and he will be given 30 days to accept another position or he will be terminated." Kantor responded that it looked like he should return to work on May 25, 2009, and Skuya replied: "Right, but there is no position for him there. He has to apply for, and receive, another position elsewhere, or they will process his termination." Skuya wanted to know if Holland would be entitled to a continuation of his salary during the 30 days while he looked for another job. She also learned from Schwan's human resources

department that Holland would not be entitled to a continuation of his salary after he was returned to full duty on May 25, 2009.

¶ 69    Also on May 19, 2009, Skuya sent an e-mail to Young and Overstreet notifying them that Holland would be eligible to return to work on Monday, May 25, 2009, and that Holland had 30 days from May 25, 2009, to find another position within the company or be terminated. Overstreet advised that he was preparing the notification letter to send to Holland by certified mail. He knew at that time that Holland would not be entitled to any salary after May 25, 2009.

¶ 70    On May 20, 2009, Overstreet sent the notification letter to Holland concerning the reassignment of his facility supervisor position. The letter states as follows:

"This letter will serve as formal notice that based on your performance and a record of unreliability, you no longer qualify for the position of Facility Supervisor at the Schwan's Home Service West Frankfort, IL depot for the reason of Unable to perform essential job functions[.] Upon your full duty release to work on May 25th, 2009, you will have a period of 30 days (5/25/09 to 6/23/09) to apply for other positions as they are posted.

If you should not find another position by your job elimination date, your employment will be terminated. ***

It is my sincere hope that you will take advantage of the opportunity to pursue other employment opportunities within Schwan's Home Service, Inc. or another subsidiary of The Schwan Food Company. Feel free to contact me *** if you have any further questions."

¶ 71    Wolfenbarger and Crider made the decision to remove Holland as the facility supervisor. Overstreet testified that back on May 5, 2009, Schwan's regional manager, Crider, told him that he had approved a new material handler position for Holland at the West Frankfort facility. Crider was the regional manager and was responsible for approving all operations positions and hours allotted. It was a special position made available only to Holland and was never posted as a job opening. According to Overstreet, Crider approved it as a full-time position, 40 hours a week. However, at the trial, Schwan's did not produce any internal e-mails, communications, an "Internal Offer Letter," or other evidence to show that Crider created a material handler position for Holland in early May 2009. It attempted to prove this fact to the jury only through Overstreet's testimony at the trial.

¶ 72    However, Overstreet's May 20, 2009, letter made no mention of a material handler position being available to Holland. Instead, the letter instructed him to apply for whatever positions might be available as posted. Overstreet testified at the trial that the letter was the start of an "interactive process" that was an exchange of communications related to the plaintiff returning to work.

¶ 73    Young and Skuya both received a copy of the notification letter. On May 22, 2009, Skuya e-mailed Young to ask him "if he even has any MH positions open." Also on May 22, 2009, Kantor generated a workers' compensation status report concerning Holland's claim. With respect to Holland's return-to-work status, she wrote in the report that his job had been reassigned and that when he reached maximum medical improvement, he will have to

reapply for a job, possibly at a new location. Under the "Disposition Plan," Kantor wrote that she anticipated that Holland would obtain an attorney due to his termination or lack of position. At this time, Skuya knew that if a job was no longer available to Holland when he was released back to full duty, he would be entitled to TTD benefits.

¶ 74    Holland received Overstreet's letter on May 22, 2009, and called Overstreet later that day. Holland's notes from his telephone conversation indicate that Overstreet told Holland that there was a material handler position open at the West Frankfort facility. Holland testified, however, that Overstreet said that the only way he could return to employment with Schwan's was to reapply for another position and that he was not to return to work until he had been accepted by Schwan's and the location general manager. Holland's notes from that conversation state, "Do not return until you apply for MH position [and] are accepted by Schwan's/LGM." Holland's notes further state that he must contact Young "on Monday 25 May to get further info" when he returns from vacation.

¶ 75    Holland testified that he did not believe that his conversation with Overstreet was a job offer because he had not received a formal internal offer from Schwan's. Holland also testified that he knew from his personal experience at the West Frankfort depot that another material handler position was not needed there. He testified that as the facility supervisor, he had been "berated" by Crider for giving the two material handlers already assigned to the depot 40-hour workweeks and that he did not have enough hours to give two of them a 40-hour week. Based on this experience, he did not believe that Schwan's was "going to be able to employ another material handler, certainly not a full time material handler."

¶ 76    Holland called Overstreet a second time on May 22 to discuss a continuation of his salary during the 30-day period he was given to find another job. Overstreet told him that his supervisor, Jeff Booth, had not approved a salary continuation during the 30-day period. As noted above, however, Kantor had asked Holland to void his May 2009 TTD disability benefits check and told him that he would receive a salary continuation through August 19, 2009. On May 26, 2009, Holland voided the TTD benefits check and sent it back to Kantor as she requested.

¶ 77    The next day, May 27, 2009, Overstreet called Holland and told him that Schwan's was denying him any salary continuation during the 30-day period. Overstreet again told Holland to contact Young about the material handler position. Holland asked about his health benefits during the 30-day period, and Overstreet said he would check on that for him.

¶ 78    Also, on May 27, 2009, Skuya sent another e-mail to Young, with a copy to Overstreet, again inquiring whether there were any positions available for Holland and, if so, whether they offered them to him. Young responded that he had not had any contact with Holland, and he further wrote, "At this point in time I have no available MH positions." The record does not contain any response e-mail from Overstreet clarifying that Crider had approved a material handler position especially for Holland earlier that month. At the trial, Young testified that he was unaware that Schwan's had created a material handler position for Holland.

¶ 79    Holland testified that on May 27, 2009, he checked Schwan's website, described above, where Schwan's posted internal job openings and where employees could go to apply for

internal job transfers. The website listed a material handler position, but he could not apply for it and could not obtain any information about it online. At 7:55 p.m. that evening, he called Young to inquire about the position, and Young informed him that he was not sure that the position existed and would have to call him back on May 28, 2009. On May 28, 2009, Young called Holland back and informed him that there was a material handler position open at the West Frankfort depot that was being offered only to him.

¶ 80     On June 2, 2009, Skuya received notice that Holland had retained a workers' compensation attorney. In forwarding the attorney's information to Kantor, Skuya indicated that she had received an e-mail from Young that Holland had contacted him but had made no effort to return to work. Skuya asked Kantor, "If there is a position available and we offer that position to him in writing and he does not accept, does that lessen the amount of wage differential he will be entitled to?" Kantor replied: "Yes. Offer away."

¶ 81     On June 3, 2009, Skuya called Young, and he told her about the material handler position that was created for Holland and that Holland was aware of the position. Holland, however, had not accepted or declined the offer. Skuya then spoke with Overstreet, and he agreed that a letter should be sent so they had written proof that a position was offered to Holland. Skuya agreed to send the letter. Skuya then prepared a letter to Holland and sent it to Kantor and Overstreet for their review before she sent it to Holland. She testified that she sent the letter to Kantor so that Kantor knew that Holland had a job to return to for purposes of Schwan's liability for TTD benefits.

¶ 82     Skuya's letter to Holland was dated June 4, 2009, and it stated as follows:

"You were released by your treating physician to return to full duty work effective May 25, 2009. At that time, you were notified that your pre-injury position had been reassigned and you were given 30 days to obtain another position within the company.

I understand there is a Material Handler I position available to you effective immediately. I have been advised that you are aware of this position, however you have not yet returned to work. Please contact your LGM, Gary Young, regarding this position and your return to work.

Please be advised, failure to accept this position and return to work by June 23, 2009[,] may be considered your voluntary resignation and your employment may be terminated effective June 23, 2009.

If you have any questions regarding this letter, please contact me ***."

¶ 83     On June 23, 2009, Skuya asked Young if Holland had accepted the material handler position, and Young responded that he had not heard from Holland and assumed he was not taking the position. Skuya then asked Overstreet if he was in agreement with processing the termination on June 25.

¶ 84     On June 25, 2009, Skuya sent an e-mail to Kantor indicating that Holland had not returned to work or called anyone about his return to work and that she would like to proceed with his termination of employment. She asked Kantor to verify that she was in agreement that Schwan's would deny any further benefits as a result of his abandoning his employment. Overstreet agreed that they should proceed with the termination because Holland had not accepted the material handler position or accepted another position.

¶ 85    Kantor responded that she needed to verify that Holland was at maximum medical improvement (MMI) and that Schwan's had to pay his medical expenses through MMI. Kantor asked Skuya to wait one day so that they could determine the position of Holland's workers' compensation attorney. Skuya agreed to wait until Kantor could follow up with Holland's attorney. On June 30, 2009, Skuya followed up with Kantor to find out Holland's MMI status. Kantor advised Skuya to send Holland a letter stating that if he did not respond to the job offer by one week from the date of the letter, she would consider it a voluntary resignation and would process his termination.

¶ 86    Skuya advised Young and Overstreet that she was sending the letter at the request of Kantor and that if Holland did not report for duty by July 6, she would process his termination. Skuya testified that Holland's termination was delayed because Kantor wanted to make sure that Holland's attorney understood that Schwan's was offering him a job. On July 1, 2009, Skuya sent the letter to Holland and his attorney giving him a "final offer of employment." She wrote that the position would remain available to him until July 6, 2009, and that she would terminate him effective July 6, 2009, if he did not accept the position. Kantor also received a copy of the letter. On July 7, 2009, Skuya sent a letter to Holland notifying him that he was terminated effective that day due to his failure to return to work. Skuya sent a copy of the letter to Young, Overstreet, and Kantor.

¶ 87    Schwan's never filled any additional material handler position at the West Frankfort depot that was purportedly offered to Holland. Crider eliminated the hours that he had allotted for the third material handler position at the depot.

¶ 88    On November 17, 2009, Holland filed his complaint against Schwan's,[1] alleging a cause of action for retaliatory discharge. At the conclusion of the seven-day trial, the jury found in favor of Holland and assessed the following damages: $135,200 for the value of past salaries and benefits lost, $125,200 for the present cash value of the salaries and benefits reasonably certain to be lost in the future, and $400,000 for emotional distress, impairment of reputation, personal humiliation, and embarrassment. In addition, the jury assessed punitive damages in the amount of $3.6 million. The circuit court entered a judgment on the jury's verdict. Schwan's now appeals the circuit court's judgment.

¶ 89                                        DISCUSSION
¶ 90                                              I
¶ 91                      Whether Schwan's Terminated Holland's Employment
¶ 92    One of the central, disputed factual issues between Holland and Schwan's concerns whether Holland resigned from his employment or whether Schwan's terminated his employment. On appeal, Schwan's argues that the trial court should not have submitted this issue for the jury to decide because the evidence conclusively established that Holland resigned and was not terminated, and therefore, as a matter of law, he could not prevail on

---

[1]The complaint also named The Schwan Food Company, Schwan's Shared Services, LLC, and Gary Young as defendants. These defendants were voluntarily dismissed.

his retaliatory discharge claim.[2] We disagree.

¶ 93    Despite the extensive evidence the parties presented during the seven-day jury trial, the facts supporting the jury's finding on the termination element of Holland's claim are simple and straightforward. Prior to May 25, 2009, Holland was temporarily and totally disabled as the result of a workplace injury when his doctor completely removed him off work so he could undergo aggressive physical therapy. At this time, under the Act, Schwan's was obligated to begin paying Holland TTD benefits. Holland's doctor reported that he would reach MMI and would be ready to return to work full duty on May 25, 2009, after completion of the aggressive physical therapy program. On May 22, 2009, however, days before he was to return to work, Holland received a letter from Overstreet informing him for the first time that he no longer qualified for his job as the facility supervisor at Schwan's West Frankfort depot.

¶ 94    Overstreet claimed at the trial that he knew at that time that a material handler position had been created specifically for Holland. The jury, however, was not obligated to believe this testimony because, in his letter, Overstreet did not inform Holland that there was a position available for him, and only him, at the West Frankfort depot when he was released for full duty. Instead, Overstreet's letter informed Holland that he must apply for "other positions as they are posted." The jury was entitled to conclude that if Schwan's had created a job specifically for Holland, as Overstreet claimed in his testimony, then there would be no need to require him to apply for "other positions as they are posted." The jury could also find it significant that the person directing Holland to apply for "other positions as they are posted" is one of Schwan's human resources generalists who is knowledgeable about Schwan's human resource procedures. This evidence *alone* was enough for the jury to conclude that Holland had no job to report to on May 25, 2009, and, therefore, had been terminated as of the day he was released for full-duty work.

¶ 95    Further evidence supports the jury's finding. The day Holland received Overstreet's letter, he called Overstreet to clarify the letter's meaning. Consistent with the written language of his letter and contrary to his testimony, Overstreet told Holland that he could not return to work for Schwan's until he applied for a new position and that he could not work until Schwan's and Young accepted him for a new position. Holland testified that Overstreet specifically told him not to return to work until he reapplied and was accepted for a new position. At that time, Holland was not earning any salary or wages. It does not require much of an inference for the jury to conclude that a person who has no job and no income, and who must apply for a new job, no longer has an employment relationship with his former employer.

¶ 96    The evidence was more than sufficient for the jury to find that, as of May 25, 2009, Holland no longer had an employer/employee relationship with Schwan's and that any

---

[2]Schwan's does not challenge the jury's finding that Holland proved the other elements of his claim, including proof of Schwan's motive in terminating his employment, *i.e.*, the jury's finding that the termination was because he exercised his right to medical care provided in the Workers' Compensation Act.

renewed employment relationship was contingent on uncertain future events, *i.e.*, an application and acceptance process. Although Overstreet told Holland to contact Young on May 25 to find out information about a material handler position, Overstreet also specifically told him not to report to work until he had applied and was accepted for another position.

¶ 97 Schwan's maintains that the evidence is undisputed that, as of May 25, 2009, a material handler position was open to Holland and that all Holland had to do was show up at the West Frankfort depot and start working on May 25, 2009. His refusal to do so, Schwan's argues, established his voluntary resignation from employment as a matter of law. Schwan's assessment of the evidence is inaccurate.

¶ 98 Overstreet's May 20, 2009, letter and his subsequent conversation with Holland are contrary to Schwan's assertion that the uncontroverted evidence is conclusively in its favor. The jury was entitled to give significant weight to evidence that Overstreet (Schwan's human resources generalist) placed an application and acceptance prerequisite prior to Holland resuming any future employment relationship with Schwan's. A reasonable jury could conclude that, if Schwan's had created a job that was specially available only to Holland and no one else, it would not require him to apply and be accepted for the job. The jury weighed this conflicting evidence and found in favor of Holland.

¶ 99 The jury's finding on this issue is further supported by additional communications that took place before and after Overstreet's May 20, 2009, correspondence. On May 7, 2009, when Overstreet was preparing the letter, he e-mailed Skuya and asked if the 30-day period that Holland had "to *apply for another position* would normally begin from the date he went out again for physical therapy, or the date he's able to return when physical therapy was completed, or the date we made the decision to reassign his position." (Emphasis added.)

¶ 100 In a separate e-mail chain, on May 19, 2009, Skuya sent Kantor an e-mail as follows: "Get ready for a battle. His position has been reassigned, and he will be given 30 days to accept another position or he will be terminated." Kantor responded that it looked like he should return to work on May 25, 2009, and Skuya replied: "Right, *but there is no position for him there*. He has to *apply for, and receive, another position* elsewhere, or they will process his termination." (Emphases added.)

¶ 101 Two days after Holland's doctor released him to work full duty, on May 27, 2009, Skuya sent another e-mail to Young, with a copy to Overstreet, again inquiring whether there was a position available for Holland and, if so, whether they offered it to him. Young responded that he had not had any contact with Holland, and he wrote, "*At this point in time I have no available MH positions*." (Emphasis added.) The jury could find it significant that the evidence did not include a response e-mail from Overstreet clarifying that Crider had approved a material handler position specifically for Holland.

¶ 102 The jury was entitled to weigh this evidence and conclude that no position was available for Holland when he was released for full-duty work on May 25, 2009, and that because he was told he had to apply for and be accepted for a new position, Schwan's terminated his employment as of May 25, 2009.

¶ 103 Furthermore, Holland testified that on May 27, 2009, he checked Schwan's website where Schwan's posted internal job openings and where employees could access to apply for

internal job transfers, but he could not apply for a material handler position and could not obtain any information about the position on the website, as was Schwan's usual practice when a position was available for an internal transfer. At 7:55 p.m. that evening, he called Young to inquire about the position, and Young informed him that he was not sure that the position existed and would have to call him back on May 28, 2009.

¶ 104    Although Overstreet testified that the position was always available to Holland, the jury could find it significant, in assessing his credibility, that he never conveyed that information to Holland, to Young, to Skuya, or to Kantor at any time prior to May 28, 2009.

¶ 105    Based on this evidence, the jury was not obligated to accept Overstreet's testimony that Crider created the position in early May 2009, and it was not obligated to accept Schwan's position that on May 25, 2009, all Holland had to do was report to the depot and begin working as a material handler. The jury, instead, was entitled to conclude that Schwan's terminated Holland and required him to reapply and be accepted for a new position before he would have any further employment relationship with Schwan's.

¶ 106    As additional support for the jury's finding, we note that the record includes evidence from which the jury could have concluded that Schwan's procedure for internally transferring an employee from one position to another is through a written internal offer letter. When asked if an internal offer letter was "the customary way that Schwan's moved someone from one position to another," Holland responded: "That's true. I had received two of them in my time at Schwan's ***." The record included a copy of the internal offer letter that Holland received when he was transferred from his manager position to the facility supervisor position at the West Frankfort depot. The record does not contain a similar internal offer letter for a transfer of Holland from the facility supervisor position to a material handler position beginning on May 25, 2009. Instead, the record contains multiple references to an application and acceptance process that Holland must successfully complete before he could begin any further employment relationship with Schwan's. The jury was entitled to find that Schwan's could not produce an "Internal Offer Letter" for Holland's new position because the position did not exist when he was released to work full duty. Under these facts, the jury's finding that Schwan's terminated Holland's employment as of May 25, 2009, is supported by the evidence presented at the trial. Therefore, we cannot overturn the jury's finding that Schwan's terminated Holland's employment.

¶ 107    We recognize that much of the evidence presented at the trial was disputed, conflicting, and could support multiple inferences. The jury could have made alternative findings after weighing the evidence. Schwan's argument on appeal concerning the evidence relevant to the discharge element of Holland's claim is founded on alternative findings that the jury could have made but did not. Schwan's urges us to hold that the jury was required to make factual findings in its favor. Our standard of review does not allow us to usurp the jury's fact-finding process when the evidence can be interpreted to support the jury's findings. Reasonable minds can differ with respect to the inferences and conclusions that can be drawn from the evidence presented at the trial concerning the discharge element of Holland's claim. Accordingly, we decline Schwan's invitation to set aside the jury's factual finding that Schwan's terminated Holland's employment.

¶ 108                                    II

¶ 109                      Judicial Estoppel and Standing

¶ 110       Schwan's next argument is that the circuit court should have granted its motion for a judgment *n.o.v.* under the judicial estoppel doctrine and because Holland lacked standing to pursue his claim. Specifically, Schwan's argues that Holland filed a bankruptcy petition, but he did not disclose his action against it as a bankruptcy asset despite his affirmative duty to do so. Schwan's concludes that Holland, therefore, is now estopped from asserting his claim. Schwan's also argues, alternatively, that Holland did not have standing to file his claim because the claim belonged to the bankruptcy trustee. We disagree with Schwan's arguments.

¶ 111                                    (a)

¶ 112                             Judicial Estoppel

¶ 113       Under the doctrine of judicial estoppel, a party who takes a particular position in a legal proceeding is estopped from taking a contrary position in a subsequent legal proceeding. *Moy v. Ng*, 371 Ill. App. 3d 957, 962, 864 N.E.2d 752, 756 (2007). Five factors are required for the doctrine to apply: (1) a party must have taken two positions, (2) the party must have taken the two positions in judicial proceedings, (3) the positions must be given under oath, (4) the party must have successfully maintained the first position and received some benefit thereby, and (5) the two positions must be "totally inconsistent." (Internal quotation marks omitted.) *Parisi v. Jenkins*, 236 Ill. App. 3d 42, 53-54, 603 N.E.2d 566, 573-74 (1992). The purpose of the doctrine is to prevent a litigant from "playing fast and loose with the courts" by intentionally taking contradictory positions in order to obtain an unfair advantage. (Internal quotation marks omitted.) *Moy*, 371 Ill. App. 3d at 963, 864 N.E.2d at 757. It is a flexible doctrine that should not be used when it would result in an injustice. *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.*, 259 Ill. App. 3d 836, 850-51, 635 N.E.2d 485, 495 (1994).

¶ 114       The trial court's determination of whether to apply the judicial estoppel doctrine is reviewed under the abuse of discretion standard. *Id.* An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *McGill v. Garza*, 378 Ill. App. 3d 73, 75, 881 N.E.2d 419, 422 (2007).

¶ 115       Schwan's argues that the court should apply the judicial estoppel doctrine to prevent Holland from reaping the benefit of taking inconsistent positions in his bankruptcy case and in the present case. We disagree.

¶ 116       On August 18, 2008, Holland filed for bankruptcy under chapter 13 of the Bankruptcy Code (11 U.S.C. §§ 1301 to 1330 (2006)). When a chapter 13 bankruptcy petition is filed, a new bankruptcy "estate" is created, and the estate is made up of all of the debtor's property at the time the case commences. *In re DiGregorio*, 458 B.R. 436, 442 (Bankr. N.D. Ill. 2011). The assets of the bankruptcy estate include all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1) (2006). The assets

of the bankruptcy estate include the debtor's unliquidated lawsuits. *Dailey v. Smith*, 292 Ill. App. 3d 22, 24-25, 684 N.E.2d 991, 993 (1997).

¶ 117     At the time he filed his bankruptcy petition in August 2008 and when the bankruptcy court confirmed his chapter 13 plan in November 2008, Holland was still employed by Schwan's and did not have a claim for retaliatory discharge. His claim against Schwan's did not arise until May 25, 2009, when it terminated his employment. Accordingly, his failure to list the nonexistent claim in his bankruptcy petition cannot be considered to be a position "totally inconsistent" with the present lawsuit; his claim against Schwan's is not a prepetition cause of action that was omitted from his initial bankruptcy petition. He could not have disclosed a claim for an injury that had not yet occurred.

¶ 118     Holland's claim arose after he had filed his bankruptcy petition and after the bankruptcy court confirmed his chapter 13 plan. Property acquired by a debtor after the commencement of a chapter 13 case, but before the case is closed, does become property of the bankruptcy estate. *In re Willett*, 544 F.3d 787, 791 (7th Cir. 2008). In addition, a cause of action is an asset that must be scheduled under section 521(a)(1) of the Bankruptcy Code (11 U.S.C. § 521(a)(1) (2006)), and a debtor's duty to disclose potential causes of action is a continuing duty. *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999). However, Holland's failure to schedule his postpetition claim against Schwan's as an asset of the bankruptcy estate does not constitute an inconsistent position given under oath. There is nothing in the record to show that Holland filed any documents in the bankruptcy proceeding after May 25, 2009, in which he omitted the existence of his claim. Therefore, although he did not properly disclose the retaliatory discharge claim, he did not take two inconsistent positions under oath.

¶ 119     Some Illinois courts have emphasized that "the doctrine of judicial estoppel is grounded in the sanctity of the oath." *Ceres Terminals, Inc.*, 259 Ill. App. 3d at 854, 635 N.E.2d at 498. Other courts have relaxed the oath requirement, but even under this alternative view, the record must "clearly reflect that the party intended the trier to accept the truth of the party's position" regardless of whether it was made under oath. *Department of Transportation v. Coe*, 112 Ill. App. 3d 506, 510, 445 N.E.2d 506, 508 (1983).

¶ 120     In the present case, under either view, we cannot conclude that the circuit court abused its discretion. We cannot hold that the circuit court should have applied the judicial estoppel doctrine when Holland did not take two contrary positions under oath and the record does not establish that he intended to omit his claim against Schwan's from his bankruptcy estate. During the trial, Holland explained that when he filed his lawsuit against Schwan's, he notified his bankruptcy attorney and that all of his bankruptcy "paperwork went through [his] bankruptcy attorney." "The Courts have been reluctant to apply the doctrine of judicial estoppel in the bankruptcy context where the nondisclosure of a claim was inadvertent." *Jaeger v. Clear Wing Productions, Inc.*, 465 F. Supp. 2d 879, 882 (S.D. Ill. 2006). In *Jaeger*, the court addressed the issue of whether to apply the judicial estoppel doctrine in a case where the plaintiff failed to disclose his cause of action in his bankruptcy proceeding. The court held that, in applying the judicial estoppel doctrine in such circumstances, it was significant whether the plaintiff's failure to disclose was an inadvertent oversight rather than a deliberate manipulation. *Id.*

¶ 121    Schwan's cites *Berge v. Mader*, 2011 IL App (1st) 103778, 957 N.E.2d 968, in support of its judicial estoppel argument, but that case is distinguishable. In *Berge*, the trial court applied the judicial estoppel doctrine in a lawsuit where the plaintiff failed to disclose her case in her initial bankruptcy petition. The issue before the court in *Berge* was whether the circuit court abused its discretion in applying the judicial estoppel doctrine (*id.* ¶ 9), while the issue before us in the present case is whether the circuit court abused its discretion in *declining* to apply the doctrine. The *Berge* court held that the trial court did not abuse its discretion in applying the judicial estoppel doctrine when the plaintiff filed several bankruptcy pleadings, under oath, that omitted her cause of action, and she benefitted from the omission because she was granted a discharge without giving her creditors any knowledge of her potential to recover a money judgment. *Id.* ¶ 14. The court distinguished *Jaeger* because, unlike *Jaeger*, the plaintiff in *Berge* knew of the undisclosed claim and had a motive to conceal it. *Id.* ¶ 19. Accordingly, the trial court in *Berge* did not abuse its discretion in applying the doctrine.

¶ 122    In the present case, we also must conclude that the circuit court did not abuse its discretion in declining to apply the doctrine. Schwan's cannot show that Holland intended to deceive the bankruptcy court or harm his creditors by hiding assets. Schwan's has not directed us to any bankruptcy pleading filed after May 25, 2009, that listed assets of the bankruptcy estate but omitted Holland's claim against Schwan's. Furthermore, he did not benefit from the nondisclosure because the bankruptcy court dismissed his chapter 13 plan for failure to make the plan's required payments. See *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) ("Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations [citation] and thus poses little threat to judicial integrity." (Internal quotation marks omitted.)). Unlike the plaintiff in *Berge*, Holland was not granted a discharge from any debts.

¶ 123    The judicial estoppel doctrine is designed to prevent a party from abusing the judicial process, but Holland testified that he informed his bankruptcy attorney when he filed his lawsuit against Schwan's and relied on his attorney to prepare any paperwork required in the bankruptcy proceeding. The doctrine of judicial estoppel is an equitable doctrine that should not be used where it would work an injustice, and under the facts of this case, we cannot fault the circuit court for declining to apply the doctrine.

¶ 124                                      (b)

¶ 125                                   Standing

¶ 126    The bankruptcy court dismissed Holland's bankruptcy petition on December 7, 2010, because he failed to pay the required payments on the plan. Upon the dismissal of the chapter 13 bankruptcy case, Holland's retaliatory discharge claim against Schwan's revested with him. 11 U.S.C. § 349(b)(3) (2006) (a dismissal of a case "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title"). At that point, it was no longer part of a bankruptcy estate. Accordingly, after the bankruptcy court dismissed Holland's chapter 13 bankruptcy petition, Holland had standing to pursue his claim, not the bankruptcy trustee. In fact, the trustee had

no standing after December 7, 2010.

¶ 127    Although Holland filed his lawsuit prior to the dismissal of the bankruptcy proceeding, a chapter 13 debtor is permitted to pursue claims "in his own name for the estate." *Cable v. Ivy Tech State College*, 200 F.3d 467, 474 (7th Cir. 1999). Accordingly, when he filed his lawsuit, Holland had standing to pursue the claim against Schwan's in his own name despite the pending bankruptcy petition and the chapter 13 plan. *Id.* Accordingly, the circuit court correctly rejected Schwan's standing argument.

¶ 128    Because we affirm the circuit court's decision on the merits of the judicial estoppel and standing issues, we need not address Schwan's argument that the circuit court erred in denying its request to amend its answer to raise judicial estoppel and standing as affirmative defenses.

¶ 129                                   III

¶ 130          Motion for a Mistrial/Evidence of Unemployment Compensation

¶ 131    The next argument Schwan's raises is that the circuit court abused its discretion in denying its motion for a mistrial. Schwan's motion for a mistrial arose when Holland attempted to admit evidence concerning his claim for unemployment benefits. Specifically, Holland attempted to admit a copy of the decision of the Illinois Department of Employment Security (the Department) concerning his claim for unemployment compensation. Schwan's argues that Holland's counsel improperly informed the jury that the exhibit showed that the Department granted Holland unemployment benefits. Schwan's objected to this evidence and moved for a mistrial. The court denied Schwan's request for a mistrial, but instructed the jury to disregard any reference to the exhibit.

¶ 132    The decision to declare a mistrial lies within the discretion of the court. *Jackson v. Reid*, 402 Ill. App. 3d 215, 229, 935 N.E.2d 978, 990 (2010). "A mistrial should be declared only as the result of some occurrence of such character and magnitude that a party is deprived of its right to a fair trial, and the moving party must demonstrate actual prejudice as a result of the ruling or occurrence." *Baker v. CSX Transportation, Inc.*, 221 Ill. App. 3d 121, 138, 581 N.E.2d 770, 782 (1991). We will not reverse the circuit court's ruling on a motion for a mistrial unless the decision is a clear abuse of discretion. *Id.*

¶ 133    Reviewing courts defer to the trial court's discretion because "the trial court has had the opportunity to consider the conduct of the trial as a whole, and therefore is in a superior position to consider the effects of errors which occurred, the fairness of the trial to all parties, and whether substantial justice was accomplished." *Magnani v. Trogi*, 70 Ill. App. 2d 216, 220, 218 N.E.2d 21, 24 (1966). A trial judge's discretion is given deference because he is in a position to observe the trial attorneys' manner of speaking and the impact their comments had on the jury. *Harrison v. Chicago Transit Authority*, 48 Ill. App. 3d 564, 566, 363 N.E.2d 81, 83 (1977).

¶ 134    At the trial, Holland's attorney asked Overstreet if he knew that Holland had applied for unemployment benefits in mid-June 2009. Holland's attorney had a copy of the decision from the Department marked as exhibit 57, and the following took place:

"Q. And in the second line of that, that's a decision from the Department of Employment Security, granting [Holland] unemployment. Right?

A. Which portion of this?

Q. That is the–That's a notification he is getting unemployment. Right?

A. I don't think I have the same thing, here, as you are looking at."

¶ 135    At this point during the questioning, Schwan's objected to the admission of evidence that the Department had granted Holland unemployment benefits on the basis of relevancy. The court sustained Schwan's objection. The court then admonished the jury as follows: "Ladies and gentlemen, I have determined that the Plaintiff's Exhibit 57 is not admissible into evidence, and you should disregard any references to that exhibit."

¶ 136    Under these facts, Schwan's cannot establish that it was denied a fair trial. The circuit court properly admonished the jury to disregard any references to the Department's unemployment decision, and there is nothing in the record that suggests that it was unable to follow the court's instructions. In general, the prejudicial impact of a remark may be cured if the trial court sustains the objection and instructs the jury to disregard the objectionable testimony. See *Nickon v. City of Princeton*, 376 Ill. App. 3d 1095, 1103, 877 N.E.2d 776, 783 (2007). The trial judge is in the superior position to assess and determine the effect of improper conduct on the part of counsel. *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338, 680 N.E.2d 483, 490 (1997). The circuit court did not consider the brief testimony concerning Holland's unemployment benefits to be prejudicial, and we defer to the circuit court because "the attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record." *Bisset v. Village of Lemont*, 119 Ill. App. 3d 863, 865, 457 N.E.2d 138, 140 (1983). Nothing in the record compels us to overturn the circuit court's exercise of discretion in denying Schwan's request for a mistrial.

¶ 137    IV

¶ 138    Jury Instructions

¶ 139    Next, Schwan's takes issue with several of the circuit court's jury instructions. "The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence presented." *Martoccio v. Western Restaurants, Inc.*, 286 Ill. App. 3d 390, 392, 675 N.E.2d 1045, 1047 (1997). The trial court's decision to instruct a jury on an issue is a matter within the court's sound discretion, and the court's decision with respect to jury instructions will not be overturned on review absent an abuse of discretion. *Id.* In determining if a trial court abused its discretion, we look at the jury instructions, taken as a whole, to determine whether they fairly, fully, and comprehensively instructed the jury of the relevant legal principles. *Thompson v. Abbott Laboratories*, 193 Ill. App. 3d 188, 200, 549 N.E.2d 1295, 1303 (1990). "Jury instructions should not overemphasize any particular matter and should be sufficiently clear so as not to confuse or mislead the jury." *Id.* "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274, 775 N.E.2d 964, 973 (2002).

¶ 140                                    (a)

¶ 141                    Instructions Concerning the Causation Standard

¶ 142    Schwan's argues that the circuit court abused its discretion in giving Illinois Pattern Jury Instructions, Civil, Nos. 250.01 and 250.02 (2011) (IPI Civil (2011)). It argues that, although they are pattern instructions, they incorrectly stated the law because they provided a "mixed motive" standard for retaliatory discharge, rather than the "but for" standard Schwan's maintains is required by law.

¶ 143    "A trial court is required to use an Illinois Pattern Jury Instruction when it is applicable in a civil case after giving due consideration to the facts and the prevailing law, unless the court determines that the instruction does not accurately state the law." *Schultz*, 201 Ill. 2d at 273, 775 N.E.2d at 972. "If the pattern instruction does not accurately state the law, the court may instruct the jury pursuant to a nonpattern instruction." *Id.* In the present case, we agree with the circuit court that IPI Civil (2011) Nos. 250.01 and 250.02 accurately stated the law.

¶ 144    Plaintiff's instruction No. 7 (IPI Civil (2011) No. 250.01) instructed the jury concerning the issues of the case as set forth in the parties' pleadings as follows:

"[1] In Count I plaintiff claims that he was an employee of the defendant on May 25, 2009.

[2] The plaintiff claims that while employed by defendant he exercised his rights under the Illinois Worker's Compensation Act to reasonable and necessary medical care.

[3] The plaintiff further claims that the reason stated in paragraph [2] above was a proximate cause of his firing and of plaintiff's claimed damages.

[4] The defendant denies that plaintiff was fired or terminated for the reason claimed by plaintiff.

[5] The defendant claims that the plaintiff was not fired, but rather voluntarily resigned after being removed from his management job due to poor performance."

¶ 145    Plaintiff's instruction No. 8 (IPI Civil (2011) No. 250.02) instructed the jury on Holland's burden of proof as follows:

"The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff was an employee of the defendant;

Second, that the plaintiff was fired from employment with the defendant;

Third, that the plaintiff was fired because he exercised his right to medical care provided under the Illinois Worker's Compensation Act[;]

Fourth, that the plaintiff sustained damages as a result of his firing[;]

Fifth, that the reasons stated in paragraph 'Third' above was a proximate cause for his firing and resulting damages.

If you find from your consideration of all the evidence that each of these propositions has been proven, then your verdict should be for the plaintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions have not

been proven, then your verdict should be for the defendant."

¶ 146   The circuit court also gave the "short form" version of IPI Civil (2011) No. 15.01 (plaintiff's instruction No. 9), which defined the term "proximate cause," to the jury as follows: "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury." At the jury instruction conference, Schwan's objected to plaintiff's instruction Nos. 7 and 8 (IPI Civil (2011) Nos. 250.01, 250.02), but did not object to plaintiff's instruction No. 9 (IPI Civil (2011) No. 15.01).

¶ 147   On appeal, Schwan's takes issue with these instructions and argues that they permitted the jury to find liability by applying the wrong causation standard. Schwan's argues that in order to sustain a retaliatory discharge claim, an employee must be discharged "because of" his or her exercise of rights under the Workers' Compensation Act. 820 ILCS 305/4(h) (West 2010). The "because of" requirement, Schwan's argues, requires a "but for" analysis. Schwan's maintains that the Illinois Pattern Jury Instructions provide a "mixed motive" standard that allows a jury to find liability when an employee suffers an adverse employment action because of both permissible and impermissible considerations. Under a "but for" analysis, however, a plaintiff is required to show that the illegal motive was the reason that the employer discharged the employee. Schwan's concludes, therefore, that the jury was improperly instructed that it could find liability if it found that a retaliatory motive was "a" reason for the plaintiff's discharge, but not necessarily "the" reason. We disagree with Schwan's analysis.

¶ 148   Holland had the burden of proving that his discharge was causally related to his filing a claim under the Workers' Compensation Act. *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 336, 704 N.E.2d 403, 406 (1998). In addressing the causation element of a retaliatory discharge plaintiff's claim, the jury had to decide "the employer's motive in discharging the employee." *Id.* The plaintiff must convince the trier of fact by a preponderance of the evidence that he was discharged for exercising his rights under the Workers' Compensation Act. *Netzel v. United Parcel Service, Inc.*, 181 Ill. App. 3d 808, 812, 537 N.E.2d 1348, 1350 (1989). The allocation of proof in a retaliatory discharge claim is reviewed using traditional tort analysis. *Clemons*, 184 Ill. 2d at 339, 704 N.E.2d at 408.

¶ 149   In *Netzel*, an employer argued that the trial court's jury instructions were inadequate because the court refused to instruct the jury "that plaintiff had to prove that he would not have been discharged 'but for' the exercise of his statutory rights." *Netzel*, 181 Ill. App. 3d at 816, 537 N.E.2d at 1353. The court, however, disagreed and found "no error with respect to the jury instructions." *Id.* at 817, 537 N.E.2d at 1353. Likewise, in the present case, we find no error with respect to the circuit court's instructions to the jury.

¶ 150   Although Schwan's presented evidence from which a jury could have concluded that it had a valid or sufficient reason for terminating Holland's employment, the mere existence of a valid or sufficient reason does not defeat a retaliatory discharge claim, because the employer's discharge can, nonetheless, be retaliatory. *Grabs v. Safeway, Inc.*, 395 Ill. App. 3d 286, 301, 917 N.E.2d 122, 134 (2009) (citing *Siekierka v. United Steel Deck, Inc.*, 373 Ill. App. 3d 214, 868 N.E.2d 374 (2007)). If the employer offers nonpretextual reasons for the

discharge, the employee still can prove by a preponderance of the evidence that his discharge was for exercising his rights under the Workers' Compensation Act. *Netzel*, 181 Ill. App. 3d at 812, 537 N.E.2d at 1350.

¶ 151    In the present case, the jury instructions informed the jury that Holland was required to prove that exercising his rights under the Workers' Compensation Act was "a proximate cause of his firing." The instructions further defined "proximate cause" as "a cause that, in the natural or ordinary course of events, *produced* the plaintiff's injury." (Emphasis added.) Accordingly, the jury instructions correctly directed the jury to find liability only if Holland proved that he was fired for exercising his rights under the Workers' Compensation Act. The instructions' requirement that Holland's workers' compensation claim must have "produced" his discharge limited the jury to finding liability only if Holland proved that he was terminated for exercising his rights under the Workers' Compensation Act. The jury instructions were consistent with traditional tort analysis and fairly, fully, and comprehensively informed the jury concerning the legal principles relevant to Holland's burden of proof and the elements of his claim.

¶ 152                                          (b)

¶ 153                  Jury Instructions Based on IPI Civil (2011) No. 60.01

¶ 154    Schwan's argues that the circuit court erred by giving unnecessary jury instructions that informed the jury about certain provisions of the Workers' Compensation Act. Specifically, Schwan's argues that plaintiff's instruction Nos. 10, 11, and 12 were not relevant to any issues involving Holland's claim for retaliatory discharge. These instructions were based on IPI Civil (2011) No. 60.01, and each instruction set forth a section of the Workers' Compensation Act. Schwan's argues that the instructions were unnecessary and confused and tainted the jury. We disagree.

¶ 155    Plaintiff's instruction No. 10 informed the jury that the language of section 19(d) of the Workers' Compensation Act was as follows: "If any employee shall refuse to submit to such medical treatment as is reasonably essential to promote his recovery, the employer may seek an Order from the Illinois Workers' Compensation Commission to reduce or suspend the compensation of any such injured employee."

¶ 156    Plaintiff's instruction No. 11 instructed the jury as follows: "The Illinois Workers' Compensation Act makes clear that it is the employer's responsibility to both 'provide and pay for' (820 ILCS 305/8) all necessary medical attention. Requesting and seeking medical attention is the crucial first step in exercising rights under the Illinois Workers' Compensation Act."

¶ 157    Plaintiff's instruction No. 12 informed the jury that the language of section 12 of the Workers' Compensation Act was as follows: "If the employee refused to attend or submit himself to examination requested by the employer from a duly qualified medical practitioner selected by the employer for the purpose of determining the nature, extent and probable duration of the injury, the right to compensation payments and medical payments shall be temporarily suspended until such examination shall have taken place."

¶ 158    Schwan's argues that the circuit court erred in giving these instructions because IPI Civil

(2011) No. 60.01 should be given only when the evidence would support a finding that the plaintiff's injury was proximately caused by a violation of a statute intended to protect against such an injury. Schwan's notes that the statutes referenced in plaintiff's instruction Nos. 10, 11, and 12 were not intended to protect against retaliatory discharge. Therefore, Schwan's argues, the trial court committed reversible error in giving the instructions.

¶ 159    Each party has the right to have the jury clearly and fairly instructed upon each theory which is supported by the evidence. *Nassar v. County of Cook*, 333 Ill. App. 3d 289, 297, 775 N.E.2d 154, 161 (2002). The test in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles, considering the instructions in their entirety. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100, 658 N.E.2d 450, 458 (1995).

¶ 160    In *Flynn v. Golden Grain Co.*, 269 Ill. App. 3d 871, 646 N.E.2d 1289 (1995), the plaintiff, an employee of an asbestos removal contractor, brought an action for injuries under the Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, ¶ 60) against the premises owner and a second contractor who supervised the removal of an oven. A jury returned a verdict in favor of the defendants, and the plaintiff appealed. The plaintiff argued that he was denied a fair trial because the jury was given an instruction, based on IPI Civil 3d No. 60.01, which paraphrased various regulations of the Occupational Safety and Health Administration (OSHA) pertaining to asbestos abatement despite the fact that he was not alleging that the defendants had violated these regulations. *Flynn*, 269 Ill. App. 3d at 879, 646 N.E.2d at 1294. The subject of the OSHA regulations concerned limiting access to asbestos removal work areas. *Id.* at 882-83, 646 N.E.2d at 1296.

¶ 161    In affirming the judgment in favor of the defendants, the *Flynn* court agreed with the plaintiff that IPI Civil 3d No. 60.01 is generally limited to situations where the evidence supports a finding that the plaintiff's injury was proximately caused by a violation of the statute or regulation. However, the court held that the OSHA regulations were material to the issue of whether one or both defendants willfully violated the Structural Work Act. *Id.* at 884, 646 N.E.2d at 1297.

¶ 162    The plaintiff in *Flynn* was required to prove that one or both defendants knew or should have known that a plywood divider was being used as a support in an unsafe manner. *Id.* In holding that the jury instruction was proper, the court stated, "Just as the jury was free to determine that the regulations would, to a reasonable person, pose an obstacle to entry and inspection of the containment area, it was equally free to find that a reasonable person exercising ordinary care would have taken the necessary steps, as spelled out in the regulations, to gain access to the area for the purpose of inspecting for unsafe work practices." *Id.* The *Flynn* court held that the instruction could not have misled the jury because "the jury was fully and accurately instructed as to the circumstances under which a violation of the Structural Work Act by one or both defendants may be found to exist." *Id.* at 884-85, 646 N.E.2d at 1297; see also *Tenenbaum v. City of Chicago*, 60 Ill. 2d 363, 375-76, 325 N.E.2d 607, 615 (1975) (ordinance regulations in an action based on the Structural Work Act aided the jury in determining whether a violation of the act was willful).

¶ 163    As noted above, in order for Holland to have succeeded in his claim against Schwan's

for retaliatory discharge, he had to prove to the jury that he was an employee before his injury, that he exercised a right granted by the Workers' Compensation Act, that he was discharged by Schwan's, and that his discharge was causally related to his filing a claim under the Workers' Compensation Act. *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 335-36, 704 N.E.2d 403, 406 (1998). The jury was instructed as follows:

"The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff was an employee of the defendant;

Second, that the plaintiff was fired from employment with the defendant;

Third, that the plaintiff was fired because he exercised his right to medical care provided under the Illinois Worker's Compensation Act[;]

Fourth, that the plaintiff sustained damages as a result of his firing[;]

Fifth, that the reasons stated in paragraph 'Third' above was a proximate cause of his firing and resulting damages.

If you find from your consideration of all the evidence that each of these propositions has been proven, then your verdict should be for the plaintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions have not been proven, then your verdict should be for the defendant."

¶ 164  Therefore, the jury was fully and accurately instructed on the elements of Holland's claim, and the instructions would not have misled the jury into finding in Holland's favor without him having proved that he was fired as a result of his exercising his rights under the Act. *Flynn*, 269 Ill. App. 3d at 884-85, 646 N.E.2d at 1297.

¶ 165  Plaintiff's instruction No. 11 is relevant to the jury's determination of whether the plaintiff proved paragraph "Third" above, *i.e.*, that he was fired because he exercised his right to medical care provided under the Illinois Workers' Compensation Act. Paragraph "Third" in the jury instruction above specifically references Holland's "right to medical care" under the Act, and plaintiff's instruction No. 11 accurately describes Holland's right to seek medical benefits under the statute.

¶ 166  With respect to plaintiff's instruction Nos. 10 and 12, they concern the plaintiff's obligation under the Act to submit to medical treatment as is reasonably essential to promote his recovery and his obligation to submit to an IME requested by Schwan's. The instructions accurately state that Holland's right to compensation and medical expenses may be suspended as a result of his failure to attend an examination requested by the employer or submit to medical treatment.

¶ 167  Plaintiff's instruction Nos. 10 and 12 were relevant because Holland had to prove Schwan's motive in terminating his employment and because he had a claim for punitive damages. The jury was instructed (plaintiff's instruction No. 14) that in determining whether to award punitive damages, it was required to determine how reprehensible Schwan's conduct was by considering, among other things, the facts and circumstances of its conduct and the frequency and duration of its misconduct. Holland presented evidence to the jury that after his doctor prescribed physical therapy, he did not schedule any sessions because he never received authorization for the therapy and was too busy at work. In addition, he

presented evidence that he failed to show up for an IME on February 13, 2009. Schwan's actions in response to these events are relevant to Holland's claim for punitive damages, and plaintiff's instruction Nos. 10 and 12 assisted the jury in understanding the evidence. Holland presented evidence that Schwan's worked him beyond his treating physician's medical restrictions as a result of his failure to attend the IME and physical therapy.

¶ 168     Concerning the physical therapy, Holland explained to Bruns that he was unable to attend physical therapy because he had not received approval for the therapy and because he was short-staffed. Holland presented evidence to the jury that Schwan's attempted to use his inability to attend physical therapy as an opportunity to end his medical care that he was entitled to under the Act, irrespective of whether he had recovered from his painful, work-related back injury. Bruns contacted Holland's treating physician, Dr. Vaught, without Holland's knowledge and attempted to get the doctor to release Holland back to full duty, not because he had recovered from his work-related injuries, but because Schwan's asserted that he was being noncompliant with his treatment plan. Dr. Vaught told her that he would not release the claimant back to full duty without reexamining him. When Dr. Vaught reexamined the claimant, he increased his work restrictions rather than releasing him to full duty with no restrictions. Bruns then requested Kantor to schedule the IME, and Holland subsequently missed the IME because of a miscommunication between him and Kantor.

¶ 169     Overstreet learned that Holland's failure to attend the IME was the result of a miscommunication. Nonetheless, Schwan's continued to sanction Holland by working him beyond his restrictions and treating him as if he had no work-related injury. Schwan's own IME doctor, however, agreed with Holland's treating physician. Nonetheless, Young told Holland that he would have to work unrestricted full duty, but Holland protested and expressed concern about the risk of further injury to his back. Young responded to Holland's concern by warning him that his refusal to work outside his doctor's restrictions would result in his immediate firing. Young also rejected Skuya's suggestion to take Holland off work for 30 days so he could complete his therapy and recovery. Young sent an e-mail to Skuya stating that Holland had "been playing this game for quite some time" and that he was "looking for a long-term solution to this problem, not a short-term wait and see."

¶ 170     The jury was entitled to consider this evidence in determining how reprehensible Schwan's conduct was in its attempt to deny Holland the protections afforded under the Workers' Compensation Act. In making this determination, the jury was aided in knowing that Schwan's acted outside the permissible boundaries of the Act when it worked Holland beyond his medical restrictions because he missed the IME and had not scheduled physical therapy. The jury instructions informed the jury of the remedies available to an employer who genuinely believes that an injured employee is refusing treatment, and that information could be considered by the jury in assessing Schwan's motive in terminating Holland. The jury could consider this evidence in finding that Holland's subsequent termination not only was illegal under the Act, but constituted a continuation of a willful and wanton pattern and practice of attempts to frustrate Holland's rights under the Act. In addition, the fact that Schwan's failed to avail itself of the remedies available to an employer who genuinely believes that an injured employee is refusing treatment could be considered by the jury in assessing Schwan's motive in terminating Holland.

¶ 171                                                  (c)

¶ 172              Jury Instructions Based on IPI Civil (2011) Nos. 14.01 and 14.04

¶ 173     Schwan's last argument with respect to the jury instructions takes issue with plaintiff's instruction Nos. 15 and 16. Plaintiff's instruction No. 15 is based on IPI Civil (2011) No. 14.01, and it instructed the jury as follows:

> "When I use the expression, 'willful and wanton conduct' I mean a course of action which shows actual or deliberate intention to harm, or if not intentional shows utter indifference to or conscious disregard for the rights guaranteed to Larry Holland by the Illinois Workers' Compensation Act to not be subject to retaliatory discharge."

¶ 174     Plaintiff's instruction No. 16 is based on IPI Civil (2011) No. 14.04, and it instructed the jury as follows:

> "It was the duty of the defendant, before and at the time of the occurrence, to refrain from willful and wanton conduct which would endanger the rights of the plaintiff."

¶ 175     Schwan's argues that these two jury instructions were improper because they urged the jury, in awarding punitive damages, to punish it for violating Holland's "rights" under the Workers' Compensation Act, which could involve acts and/or omissions that have nothing to do with his termination and were not at issue in the trial. We disagree. Plaintiff's instruction No. 15 expressly defines "willful and wanton conduct" in terms of Holland's right "to not be subject to retaliatory discharge." In addition, evidence of Schwan's violations of Holland's rights under the Workers' Compensation Act was relevant for the jury to assess Schwan's motives in terminating his employment and the reprehensibility of its conduct. In determining whether to assess punitive damages, the jury can consider the act itself as well as other circumstances including the motives of the wrongdoer, the relations between the parties, and the provocation or want of provocation for the act. *Statler v. Catalano*, 167 Ill. App. 3d 397, 406, 521 N.E.2d 565, 572 (1988).

¶ 176     Also, as Holland correctly argues, "[t]o preserve an objection to a jury instruction a party must both specify the defect claimed and tender a correct instruction." *Deal v. Byford*, 127 Ill. 2d 192, 202-03, 537 N.E.2d 267, 271 (1989). "If the defendants believed that the jury instructions used in this case were incorrect, incomplete, or otherwise inadequate, it was their duty to object to the instructions and to offer their own remedial versions." *Id.* at 203, 537 N.E.2d at 271. Schwan's objected to plaintiff's instruction Nos. 15 and 16, but the record does not indicate that it submitted its own instruction containing what it believed to be the correct statement of the law concerning willful and wanton conduct. Therefore, its objection to plaintiff's instruction Nos. 15 and 16 is waived. *Aguinaga v. City of Chicago*, 243 Ill. App. 3d 552, 576, 611 N.E.2d 1296, 1314 (1993) (plaintiff's counsel failed to offer remedial versions of the instructions; therefore, "if there was any error in tendering the *** instructions to the jury, the plaintiff has waived the issue").

¶ 177                                                    V

¶ 178                    Admissibility of Schwan's Insurance Carrier's Claim File

¶ 179       Schwan's next argues that the circuit court erred in admitting into evidence its workers' compensation insurance carrier's (Hartford's) claim file. The claim file contained the notes of SRS's workers' compensation adjuster, Joan Kantor, in which she documented her communications with various Schwan's agents and employees relevant to the handling of Holland's workers' compensation claim. Kantor did not testify at the trial. Schwan's argues that the claim file was inadmissible hearsay evidence. The circuit court admitted the claim file into evidence over Schwan's objection, ruling that Kantor's notes were not hearsay because they were not being offered for the truth of the matters asserted in the notes, but were being admitted for the purpose of showing the knowledge of Schwan's employees. The court ruled that only the portions of the claim file that documented communications between Hartford and Schwan's were admissible "for the purpose of showing their [Schwan's] knowledge." The court ordered the redaction of all other portions of the file. The circuit court also admitted the claim file over Schwan's objections based on the attorney-client privilege and the work-product doctrine.

¶ 180       Prior to the trial, the parties stipulated that Hartford's claim files "are true and genuine business records kept in the ordinary course of business containing information regularly utilized in said business and shall be self-authenticating without need for a witness sponsor." The stipulation preserved Schwan's objections to the admission of the claim file based on the following objections: that it is irrelevant; that its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or waste of time; that it was prepared in anticipation of workers' compensation litigation; and that it contains hearsay within hearsay (Ill. R. Evid. 805 (eff. Jan. 1, 2011)).


¶ 181                                                   (a)

¶ 182                                      Hearsay Within Hearsay

¶ 183       On appeal, Schwan's renews its objection to the claim file on the basis that it contained hearsay statements. "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted in court and is generally inadmissible unless it falls within a hearsay exception." *Rowe v. State Bank of Lombard*, 247 Ill. App. 3d 686, 697, 617 N.E.2d 520, 528 (1993). Illinois Supreme Court Rule 236(a) (eff. Aug. 1, 1992) provides a "business records" exception to the hearsay rule. Rule 236(a) states, in relevant part, as follows:

> "Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility." Ill. S. Ct. R. 236(a) (eff. Aug. 1, 1992).

¶ 184    "The rationale underlying the admissibility of business records is the recognition that businesses are motivated to keep routinely accurate records and that they are unlikely to falsify records kept in the ordinary course of business and upon which they depend." *People v. Virgin*, 302 Ill. App. 3d 438, 450, 707 N.E.2d 97, 105 (1998). However, Rule 805 of the Illinois Rules of Evidence, which became effective on January 1, 2011, provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Ill. R. Evid. 805 (eff. Jan. 1, 2011). Therefore, pursuant to Rule 805 of the Illinois Rules of Evidence, when a business record contains hearsay statements within the record, the hearsay statements within the record must also be admissible under an exception to the hearsay rule. See, *e.g.*, *Hunt v. Dart*, 754 F. Supp. 2d 962, 967 n.3 (N.D. Ill. 2010) (interpreting Rule 805 of the Federal Rules of Evidence: "Rule 805, the hearsay within hearsay rule, requires that statements within a business record must, themselves, qualify under an exception to the hearsay rule.").

¶ 185    In the present case, as noted above, the circuit court ordered that the claim file be redacted except for statements that were made by the insurance adjustor (Kantor) to Schwan's employees and statements from Schwan's employees to Kantor. Statements made by Schwan's employees are admissible against Schwan's as a party admission. A statement by an employee is admissible against the employer as a party admission if it is made during the existence of the employment relationship and concerns matters within the scope of the employment. *Vojas v. K mart Corp.*, 312 Ill. App. 3d 544, 548, 727 N.E.2d 397, 401 (2000). In addition, statements made by a party's agent about a matter within the scope of his or her agency and made by virtue of the agent's authority are party-opponent admissions. *Jenkins v. Dominick's Finer Foods, Inc.*, 288 Ill. App. 3d 827, 834, 681 N.E.2d 129, 134 (1997). Accordingly, statements made by Schwan's agents and employees that were documented by Kantor in her file are admissible as party admissions.

¶ 186    With respect to Kantor's statements to Schwan's employees that Kantor recorded in the claim file, we note that the circuit court admitted Kantor's statements contained in the claim file to establish only that Kantor made the statements, not as proof of any matter asserted by Kantor in her statements. The circuit court ruled that Kantor's statements were relevant to show Schwan's knowledge. "[E]vidence that is offered to show a person's knowledge or awareness of a circumstance and not to establish the truth of the circumstance is not hearsay." *People v. Prather*, 2012 IL App (2d) 111104, ¶ 11, 979 N.E.2d 540. In addition, it is not hearsay to use an out-of-court statement for the purpose of establishing whether or not the statement was made and not for the truth of the matter asserted in the statement. *People v. Clark*, 47 Ill. App. 3d 624, 628, 365 N.E.2d 20, 25 (1977).

¶ 187    Plaintiff's exhibit 67 is the redacted copy of Hartford's claim file. As noted above, it contains only documented communications between Kantor and Schwan's employees. The exhibit is 29 pages in length and includes communications for the period of August 26, 2008, through August 21, 2009. In its brief, Schwan's raises a generalized hearsay objection to the entire claim file, but that argument is not persuasive for the reasons noted above. Schwan's

offers a specific hearsay argument and hearsay analysis[3] with respect to only one statement contained in the 29-page exhibit.

¶ 188    Schwan's objects to the following entry Kantor made in the claim file on January 27, 2009:

> "Rcvd call from eva [Bruns], she just rcvd note from pac at dr ofc, that gives ee even more restrictions than he had before, saying he can only work 6 hours on days he has pt. restricts lifting etc. it is time for ime. ee has been on l/d for over 150 days & he knows his head is on the chopping block."

¶ 189    Neither Bruns nor Kantor testified at the trial. When Skuya testified about Kantor's January 27, 2009, note, she did not know whether the "chopping block" comment was added by Kantor or whether the comment was part of Kantor's notation of what Bruns said in her telephone conversation with Kantor. Accordingly, Schwan's argues that the record does not establish who made the out-of-court statement, "he knows his head is on the chopping block." Therefore, Schwan's argues, it should have been excluded as hearsay because it could have been Kantor's statement and not one attributable to Schwan's.

¶ 190    We believe that whether Kantor or Bruns made the "chopping block" comment and how much weight, if any, to place on the comment was an issue for the jury to consider. More importantly, the "chopping block" comment was, at most, cumulative of other admissible evidence. Accordingly, the comment cannot be considered so prejudicial that it affected the outcome of the seven-day trial.

¶ 191    The jury could have concluded that Bruns made the "chopping block" comment because a few days before, on January 15, 2009, Kantor documented a previous statement by Bruns that Holland was "under the gun at work for very poor job performance issues" and that "he will be replaced soon I imagine since hsi [*sic*] FMLA has run out."

¶ 192    Regardless, Schwan's has not established a basis for reversing the jury's verdict due to the admission of this one statement into evidence. Evidentiary rulings will not be reversed unless the error "was substantially prejudicial and affected the outcome of trial." *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471, 569 N.E.2d 167, 172 (1991). "The burden is on the party seeking reversal to establish prejudice." *Id.* Schwan's has not made a convincing argument that the "chopping block" comment was substantially prejudicial and affected the outcome of the seven-day trial. The jury considered substantial evidence of communications between Schwan's employees and the insurance adjuster concerning their efforts to remove Holland as the facility supervisor. The "chopping block" comment was cumulative to this evidence.

---

[3]In the statement-of-facts segment of its brief, Schwan's notes that it made various relevancy objections to portions of the Hartford claim file, but in its argument section of its brief, it does not offer any relevancy analysis or authority with respect to the SRS claim file. Its arguments are based on hearsay, the attorney-client privilege, and the work-product doctrine.

¶ 193 (b)

¶ 194 Attorney-Client Privilege

¶ 195 Schwan's argues, alternatively, that the claim file was not admissible under the attorney-client privilege. The attorney-client privilege is designed to promote and encourage open and frank consultation between a client and his attorney. *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 551, 810 N.E.2d 217, 226 (2004). The privilege extends to communications between an insured and its insurer. *People v. Ryan*, 30 Ill. 2d 456, 460-61, 197 N.E.2d 15, 17 (1964). The basis for extending the privilege to an insurer is that the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured. *Id.* "The party claiming the attorney-client privilege bears the burden of presenting factual evidence that establishes the privilege." *Pietro*, 348 Ill. App. 3d at 551, 810 N.E.2d at 226. "Because it is the privilege, not the duty to disclose, that is the exception, the privilege ought to be strictly confined within its *narrowest possible limits*." (Emphasis added.) *Buckman v. Columbus-Cabrini Medical Center*, 272 Ill. App. 3d 1060, 1066, 651 N.E.2d 767, 771 (1995).

¶ 196 To extend the attorney-client privilege to an insurer, the party asserting the privilege must prove: (1) the identity of the insured, (2) the identity of the insurance carrier, (3) the duty to defend a lawsuit, and (4) that a communication was made between the insured and an agent of the insurer. *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 407, 698 N.E.2d 641, 649 (1998). In addition, the court in *Chicago Trust Co.* also noted that the insurer-insured privilege, as an offshoot of the attorney-client privilege, applies only when " 'the insured may properly assume that the communication is made to the insurer *for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured*.' " (Emphasis in original.) *Id.* at 409, 698 N.E.2d at 651 (quoting *Ryan*, 30 Ill. 2d at 461, 197 N.E.2d at 17).

¶ 197 Under the facts of the present case, the attorney-client privilege does not apply to exclude Hartford's claim file. There is no evidence in the record that supports the conclusion that the Hartford claim file contains communications that were made "for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured." *Ryan*, 30 Ill. 2d at 461, 197 N.E.2d at 17. The statements made by Schwan's employees that are recorded in the claim file were not made for the purpose of seeking legal advice but pertained to Holland's medical treatments, work restrictions, and conditions of ill-being. When the statements were made, Schwan's and Hartford both agreed that Holland suffered from conditions of ill-being as a result of a workplace accident, and they did not dispute that his claim was covered under the Workers' Compensation Act. Accordingly, the purpose of the statements contained within the claim file was to help Schwan's and Hartford administer Holland's workers' compensation claim, rather than to enable Schwan's to obtain legal counsel. There is no evidence that the statements were made in order to deliver them to an attorney for the purpose of preparing a defense to Holland's workers' compensation claim. In addition, there is no evidence that at the time the statements were made anyone anticipated delivering the statements to an attorney for the purpose of legal advice. Accordingly, the statements are not in the nature of attorney-client communications and do not fall within the

limited attorney-client privilege that has been extended to insurer/insured relationships.

¶ 198                                             (c)

¶ 199                   Business Record Prepared in Anticipation of Litigation

¶ 200    Schwan's also argues that the claim file is inadmissible because it is a business record that was made in anticipation of litigation. Therefore, Schwan's argues, it is inadmissible because it does not possess the same trustworthiness of other business records prepared in the ordinary course of business. See *City of Chicago v. Old Colony Partners, L.P.*, 364 Ill. App. 3d 806, 819, 847 N.E.2d 565, 566 (2006). This rule is based on the conclusion that the motivation of a person preparing a report that he intends to use in future litigation could affect its trustworthiness. *Poltrock v. Chicago & North Western Transportation Co.*, 151 Ill. App. 3d 250, 254, 502 N.E.2d 1200, 1203 (1986).

¶ 201    However, there is no evidence in the record that the Hartford claim file was created in anticipation of litigation as opposed to in its regular course of business. As noted above, Schwan's and Hartford did not dispute that Holland had been injured in a workplace accident and was entitled to workers' compensation benefits. The notes contained within the claim file were made in the regular course of business processing Holland's claim, a claim that was not disputed at the time the notes in the claim file were created. Accordingly, the claim file does not suffer from a lack of trustworthiness that would remove it from admissibility under the business-records exception to the hearsay rule.

¶ 202    Furthermore, this "anticipation of litigation" rule does not apply where the report is sought to be admitted *against* the party who prepared it. *Amos v. Norfolk & Western Ry. Co.*, 191 Ill. App. 3d 637, 645-46, 548 N.E.2d 96, 101 (1989). "Where the report is damaging to the party who prepared it ***, there is no reason to question its trustworthiness." *Id.* at 646, 548 N.E.2d at 101. In the present case, although Schwan's did not prepare the claim file, it was, nonetheless, prepared by SRS in administering a workers' compensation claim on behalf of Hartford and Schwan's. Holland admitted the claim file, and there is no reason to question the motivation or credibility of Kantor with respect to statements that are unfavorable to Schwan's that are contained within the Hartford claim file. See *Moffett v. McCauley*, 724 F.2d 581, 584 n.1 (7th Cir. 1984) ("this rule does not apply where, as here, the evidence is offered against the party for whom [the report] was prepared").

¶ 203                                             (d)

¶ 204                           Work-Product Doctrine

¶ 205    Finally, Schwan's argues that the claim file should not have been admitted into evidence under the work-product doctrine. The work-product doctrine is separate and distinct protection from the attorney-client privilege. *Janousek v. Slotky*, 2012 IL App (1st) 113432, ¶ 34, 980 N.E.2d 641. Illinois Supreme Court Rule 201(b)(2) defines work product as follows: "Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney." Ill. S. Ct. R. 201(b)(2) (eff. July 1, 2002). "The work-product doctrine

provides a broader protection than the attorney-client privilege, and is designed to protect the right of an attorney to thoroughly prepare his case and to preclude a less diligent adversary attorney from taking undue advantage of the former's efforts." *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 196, 579 N.E.2d 322, 329 (1991). Any relevant material generated in preparation for trial which does not disclose "conceptual data" is freely discoverable under Rule 201(b)(2). *Id.* at 196, 579 N.E.2d at 329-30.

¶ 206    In the present case, as noted above, there is nothing in the record to suggest that the claim file was generated in preparation for trial. The claim file was prepared to assist Hartford in processing Holland's workers' compensation claim. It was not prepared by Schwan's or on behalf of Schwan's in preparation for Holland's claim of retaliatory discharge. Accordingly, the claim file is not protected under the work-product doctrine. In addition, there is nothing in the file that reveals "the theories, mental impressions, or litigation plans" of Schwan's attorney. *Cangelosi v. Capasso*, 366 Ill. App. 3d 225, 851 N.E.2d 954 (2006) (nurse's notes were not protected under the work-product doctrine where they did not contain or disclose theories, mental impressions, or litigation plans of any party's attorney). Schwan's attempt to raise the work-product doctrine to prevent Holland from using the Hartford claim file stretches the doctrine's protection beyond its intended purpose.


¶ 207                                              VI

¶ 208                                   Compensatory Damages

¶ 209    Next, Schwan's raises issues concerning the amount of compensatory damages awarded by the jury. Specifically, Schwan's challenges the jury's award for lost past and future salaries and benefits and its award for emotional damages. Schwan's argues that the jury's awards for lost salaries and benefits are improper because the jury disregarded uncontroverted evidence that Holland failed to mitigate those damages. With respect to the jury's award for emotional damages, it argues that the amount of the award is excessive and, therefore, against the manifest weight of the evidence. We disagree and affirm the jury's compensatory damages awards.


¶ 210                                             (a)

¶ 211                     Failure to Mitigate Damages for Lost Wages

¶ 212    "The trier of fact determines the amount of damages and, as a reviewing court, we give great deference to a jury's award of damages." *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661-62, 946 N.E.2d 414, 419 (2011). "A verdict will not be set aside by a court unless it is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572, 851 N.E.2d 866, 877 (2006).

¶ 213    The duty to mitigate damages requires an injured party to exercise reasonable diligence and ordinary care in trying to minimize his damages. *Amalgamated Bank of Chicago v. Kalmus & Associates, Inc.*, 318 Ill. App. 3d 648, 658, 741 N.E.2d 1078, 1086 (2000). "The

duty to mitigate will not be invoked as grounds for a hypercritical examination of a plaintiff's conduct." *Id.* at 660, 741 N.E.2d at 1087. The failure to mitigate damages is an affirmative defense that must be pleaded and proved by the defendant. *Rozny v. Marnul*, 43 Ill. 2d 54, 73, 250 N.E.2d 656, 666 (1969). The jury's finding on the issue of whether the plaintiff failed to mitigate damages is reviewed under the manifest weight of the evidence standard. *Templeton v. Chicago & North Western Transportation Co.*, 257 Ill. App. 3d 42, 60, 628 N.E.2d 442, 454 (1993).

¶ 214    In the present case, Holland testified that he applied for numerous positions with other companies, attended job fairs, filled out 8 to 10 applications per week, and attended interviews with several potential employers. He believed that he could have obtained employment with the Transportation Safety Administration if he had not failed the physical. Based on the evidence presented at the trial, we cannot say that the jury was required to find that Holland failed to mitigate his damages.

¶ 215    Schwan's argues that it met its burden of proving that Holland did not mitigate his damages with evidence that it offered him a position as a material handler, but he never accepted the job. The jury, however, was not obligated to find that this was a legitimate job offer. The jury heard evidence that there was not enough work to keep two part-time material handlers busy at the West Frankfort depot. In fact, Schwan's never did place a third material handler at the West Frankfort depot because the extra worker was not needed at the depot. Accordingly, the jury was not required to find that Schwan's made a *bona fide* offer of employment. Instead, it was entitled to find that the offer was a sham that was designed to circumvent its responsibility under the Workers' Compensation Act. *Reliance Elevator Co. v. Industrial Comm'n*, 309 Ill. App. 3d 987, 993, 723 N.E.2d 326, 331 (1999) ("Employers must not be allowed to defeat an injured employee's entitlement to a disability award by making sham job offers."). Therefore, we affirm the jury's award for Holland's lost salary and benefits.

¶ 216                                                                    (b)

¶ 217                                              Jury's Award for Emotional Damages

¶ 218    Next, Schwan's challenges the jury's award of $400,000 for emotional damages. "The issue of damages is particularly within the discretion of the jury[,] and courts are reluctant to interfere with the jury's exercise of its discretion." *Chrysler v. Darnall*, 238 Ill. App. 3d 673, 678, 606 N.E.2d 553, 558 (1992). "A jury's award of damages will not be overturned unless it was against the manifest weight of the evidence." *Napcor Corp. v. JP Morgan Chase Bank, NA*, 406 Ill. App. 3d 146, 157, 938 N.E.2d 1181, 1191 (2010). "An award of damages will be considered excessive only if it exceeds the range of fair and reasonable compensation, results from passion or prejudice, or is so large that it shocks the judicial conscience." *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 96, 885 N.E.2d 396, 410 (2008). Under these standards, we cannot say that the jury's award for emotional damages was excessive.

¶ 219    In determining the amount of emotional damages to award Holland, the jury considered his testimony that, as a result of Schwan's retaliatory discharge, he suffered from emotional

distress and was forced to cash out his retirement and pension funds in an attempt to keep current on the payments required under his chapter 13 bankruptcy plan. He felt embarrassment and a sense of failure when his house was foreclosed on after his chapter 13 bankruptcy was dismissed by the bankruptcy court for failure to make the required payments. He described his embarrassment from an incident when he had to chase a repossession tow truck and plead with the truck's driver in order to recover personal belongings from the vehicle. He had to borrow his daughter's and mother-in-law's vehicles. He told the jury about the stress and anxiety he suffered from losing his medical insurance, which he relied on to provide for medication for his psychotic son. He felt shame and a sense of failure when he could not afford to send his daughter with her classmates on her senior trip and when his wife was forced to get a second part-time job because he could not find work.

¶ 220    Likewise, Holland's wife also told the jury about changes in Holland's mood and behavior, that he became more withdrawn and temperamental as a result of the retaliatory discharge, that he stopped eating dinner with his family, and that he displayed unusual fits of anger about trivial matters. Holland told his wife that she would be better off without him.

¶ 221    Schwan's cites *Babikian v. Mruz*, 2011 IL App (1st) 102579, 956 N.E.2d 959, and asks us to compare Holland's award for emotional distress with the jury's award in *Babikian*. We decline to do so. Illinois courts "have traditionally declined to make such comparisons in determining whether a particular award is excessive." *Richardson v. Chapman*, 175 Ill. 2d 98, 114, 676 N.E.2d 621, 628 (1997). The jury in the present case was entitled to weigh the evidence relevant to Holland's emotional distress and determine the appropriate amount of emotional damages to award him for Schwan's retaliatory discharge. Considering the evidence before the jury, we will not second-guess the amount of its award.

¶ 222                                        VII

¶ 223                              Punitive Damages

¶ 224    Finally, Schwan's challenges the jury's award of punitive damages. It argues that the circuit court abused its discretion in instructing the jury to consider punitive damages and that the amount of the jury's award of punitive damages is excessive and unconstitutional. We disagree.

¶ 225                                        (a)

¶ 226    The Trial Court's Submission of Punitive Damages Instructions to the Jury

¶ 227    In Illinois, before a jury can consider the issue of punitive damages, the circuit court must make a preliminary determination of whether the facts of the particular case justify submitting the issue to the jury for consideration. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138, 818 N.E.2d 357, 367 (2004). "Once a trial court determines that punitive damages are, as a matter of law, appropriate to the cause of action, the trial court's decision to submit the issue to the jury will not be reversed absent an abuse of discretion." *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 179, 882 N.E.2d 1102, 1118 (2008).

¶ 228    "Punitive damages may properly be awarded in a case sounding in retaliatory discharge."

*Paz v. Commonwealth Edison*, 314 Ill. App. 3d 591, 601, 732 N.E.2d 696, 706 (2000). They are intended to punish the wrongdoer and serve as a deterrent to antisocial behavior in the future. *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1159, 845 N.E.2d 816, 824 (2006). "Punitive damages may be awarded where retaliatory discharge has been committed with fraud, actual malice, deliberate violence or oppression, or when the defendant has acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Blount v. Stroud*, 395 Ill. App. 3d 8, 20, 915 N.E.2d 925, 938 (2009). The trial court may submit the issue of punitive damages to the jury only if the plaintiff has made out a *prima facie* case for such damages. *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138, 818 N.E.2d 357, 367 (2004).

¶ 229    In the present case, we find no error in the circuit court's initial decision to submit the punitive damages claim to the jury. A circuit court's decision is an abuse of discretion only when the ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Blum v. Koster*, 235 Ill. 2d 21, 919 N.E.2d 333 (2009). Holland presented sufficient evidence from which a jury could find that Schwan's acted willfully and wantonly in terminating his employment. Accordingly, we cannot hold that the circuit court abused its discretion in submitting the issue to the jury.

¶ 230    From the evidence presented at the trial, the jury was entitled to find that Schwan's, through its agents and employees, engaged in a course of conduct that was designed to punish Holland for exercising his rights under the Workers' Compensation Act and ultimately terminated his employment as its final act of punishment. Holland presented sufficient facts from which the jury could conclude that Schwan's engaged in willful acts that demonstrated a wanton disregard for his rights under the Workers' Compensation Act.

¶ 231    It is undisputed that Holland was injured in a job-related accident and that he required medical treatment, physical therapy, and job restrictions in order for him to recover from the workplace injury. Holland presented evidence, however, that Schwan's never honored the medical restrictions imposed by Holland's treating physicians and did not accommodate his work schedule for effective physical therapy. From the outset, Schwan's required Holland to work well beyond his medical restrictions. In addition, at the same time that Holland was required to work beyond his medical restrictions, Schwan's began running the clock on his leave allowance under the FMLA because it had purported to have placed him in a light-duty program. In submitting the issue of punitive damages, the circuit court properly recognized that this is evidence that the jury could consider in determining whether Schwan's engaged in willful and wanton conduct.

¶ 232    When Holland injured his back in August 2008, his treating physician, Dr. Lueking, suspected that he possibly ruptured a disc in his back and allowed Holland to return to work with the following restrictions: "no heavy lifting, no prolonged standing and should be on light duty only with minimal driving." Schwan's claimed it placed Holland in its TAD program designed to provide injured workers with temporary job duties within their medical restrictions. The evidence established that Holland's placement in this program was in name only because his job duties did not change to light duty. In fact, they did not change at all.

¶ 233    Holland testified that, after being placed in the TAD program, his supervisor at that time,

Underwood, told him that his medical restrictions were fine "as long as the job gets done." Underwood did not take any action to modify Holland's job duties or otherwise relieve him of duties that fell outside his work restrictions, although it was his responsibility to do so. Therefore, despite Schwan's designating Holland as being in its "TAD program," Holland had to complete all of the same tasks he did before the accident so that "the job gets done," including all of the tasks that fell outside his treating physician's medical restrictions.

¶ 234 The obvious result of Schwan's actions is that the conditions of Holland's job-related injury did not improve, but, in fact, became worse and even severe. By October 17, 2008, his treating physician added the additional restriction that he not lift anything greater than five pounds and no prolonged exposure to cold temperatures. Finally, in December 2008, when Holland explained to Underwood that his pain symptoms from the job-related accident had become severe, Underwood began relieving him from the duties of unloading goods from semitrucks that arrived every eighth day. However, Schwan's required Holland to continue performing all of his other duties that fell outside his light-duty restriction, including repetitive bending, twisting, prolonged standing, and lifting over 25 pounds. The obvious conclusion from this testimony, if found credible, is that Schwan's actions increased the pain that Holland suffered as a result of the workplace accident. The jury was entitled to consider this evidence in evaluating Schwan's wanton disregard for Holland's rights under the Workers' Compensation Act.

¶ 235 The jury also heard evidence that Holland's treating physician prescribed physical therapy and that Holland had requested authorization for physical therapy, but he did not receive immediate authorization from Schwan's or its insurance carrier. Therefore, no physical therapy appointments were scheduled. In January 2009, the workers' compensation specialist handling Holland's workers' compensation claim, Kantor, confronted Holland with his failure to attend any physical therapy appointments. Holland explained that he had not received any authorization and, in addition, that his work schedule limited his ability to attend physical therapy because the West Frankfort depot was short one material handler.

¶ 236 As further evidence of Schwan's willful and wanton conduct, the jury was entitled to consider Schwan's actions following Kantor's communication with Holland concerning physical therapy. As noted above, the Workers' Compensation Act provides specific remedies for an employer when it believes that an employee has failed to submit to medical treatment that is reasonably essential to promote his recovery. The employer can seek an order from the Workers' Compensation Commission to suspend benefits until the employee submits to such treatment. Schwan's disregarded the statute and, instead, through its agent, Bruns, contacted Holland's treating physician without Holland's knowledge and attempted to obtain the doctor's release for full-duty work without any restrictions, although that request was unrelated to his recovery from the injury.

¶ 237 The jury knew that Schwan's engaged in this subversive tactic during the exact same time period in which it worked Holland beyond his medical restrictions to the point that he was suffering from severe pain symptoms from his job injury. Again, the circuit court was well within its discretion in recognizing that this is evidence from which a jury could conclude that Schwan's subsequent termination of Holland's employment was a willful and wanton attempt to deny him the protections and benefits of the Workers' Compensation Act. This

-44-

evidence supports a finding that Schwan's engaged in a course of conduct specifically designed to subvert the intent of the statute.

¶ 238    Bruns was unsuccessful in her attempt to get Dr. Vaught to release Holland back to work with no restrictions. The doctor insisted on examining him before he would issue a full-duty work release. When Dr. Vaught reexamined Holland on January 26, 2009, he did not release him to full duty but *increased* his job restrictions so that he was not to work more than six hours on the days he had physical therapy appointments. The increased restrictions were not well received by Schwan's and set off further efforts by Schwan's agents and employees to frustrate Holland's rights under the Workers' Compensation Act.

¶ 239    Holland testified that when he discussed Dr. Vaught's increased work restrictions with his supervisor, Young, the supervisor rejected any change in Holland's work schedule to accommodate the required physical therapy. Wolfenbarger and Overstreet also began an effort to confirm that Holland had exhausted his FMLA leave protection by being placed in the TAD program as noted above. Bruns confirmed to Overstreet that she believed that Holland had exhausted his FMLA leave, that it was therefore okay to replace him, and that she was seeking an IME "to address all the issues that seem to prevent his return to work full duty."

¶ 240    On February 6, 2009, the organization that handled FMLA leave on behalf of Schwan's confirmed that Holland had exhausted his FMLA leave, and the next day, Wolfenbarger prepared Holland's 2008 annual evaluation one month early and without Holland's input, giving him a bad performance evaluation, although Wolfenbarger had not personally observed Holland's work in 2008. He gave inconsistent testimony about going over the evaluation with Holland as was Schwan's usual practice. On cross-examination, he finally admitted that he did not go over the evaluation with Holland, but merely signed it after Young faxed it back to him with Holland's signature. Again, the jury was entitled to consider this evidence and conclude that the evaluation was part of Schwan's wanton effort to deny Holland the Workers' Compensation Act's protection.

¶ 241    When Holland missed the IME due to a miscommunication with Kantor, Schwan's again ignored the remedies of the Workers' Compensation Act as a result of the missed IME. Instead, Young told Holland that he was required to come back to work full duty regardless of his doctor's medical restrictions. In weighing this evidence with respect to Schwan's conduct, the jury could find it significant that Wolfenbarger told it that he had no knowledge of Holland's workers' compensation claim when he completed the 2008 evaluation, but the jury heard evidence that Wolfenbarger chastised Holland for missing physical therapy appointments a few weeks before he completed the evaluation.

¶ 242    Holland subsequently attended the IME performed by Schwan's chosen medical expert, and the doctor's restrictions included restricting Holland from lifting anything over 15 pounds, along with the existing restrictions of no repetitive bending, stooping, or twisting. At that point, Schwan's workers' compensation specialist, Skuya, suggested that perhaps Schwan's should take Holland totally off work so he could complete his therapy. Young told Skuya that he would not take Holland off work because he needed the help and to extend Holland's TAD program another 30 days. Skuya, therefore, sent Holland a letter that stated

that, in light of the IME, Schwan's had granted him one final 30-day extension in the TAD program. The jury heard evidence, however, that Holland's TAD program status offered him no substantive change or relief in his work duties. The jury was entitled to find, based on this evidence, that Holland's participation in Schwan's "TAD program" was a sham and was used as part of Schwan's wanton disregard of Holland's rights under the Workers' Compensation Act, which ultimately resulted in a retaliatory discharge.

¶ 243 Holland complied with all of his physical therapy requirements, but Schwan's continued to work him beyond his medical restrictions, which frustrated his doctor's prescribed treatments. Therefore, on April 28, 2009, his doctor took him completely off work until May 19, 2009, so he could receive more aggressive physical therapy and complete his recovery. When Schwan's learned of this new restriction, a flurry of e-mails was exchanged among Skuya, Overstreet, Wolfenbarger, Young, and Kantor, strategizing on how Schwan's could remove Holland from his job position. Even though Schwan's own IME expert agreed with Dr. Vaught's treatments, Skuya suggested doing "some surveillance on him," and Young suggested that Holland had "been playing this game for quite some time."

¶ 244 Overstreet subsequently prepared the letter that terminated Holland's employment relationship with Schwan's by notifying him that he was no longer qualified for his previous position with Schwan's and that he could "apply for other positions as they are posted." Skuya and Young both admitted in e-mails that there was no position available for him, and Overstreet sent the letter knowing that Holland would not receive any compensation from Schwan's after he recovered from his workplace accident and could return to full-duty work. In fact, he timed the letter to coincide with Holland's release for full-duty work.

¶ 245 The evidence presented at the trial demonstrates that the jury could find that Schwan's discharge was a willful and wanton retaliation for exercising his rights under the Act which justified punitive damages. The jury could find that Schwan's actions, when considered in their entirety, showed a pattern of willful and wanton disregard for Holland's rights as an injured worker, including his protection against termination for exercising his rights under the statute. Punitive damages play a crucial role in protecting against violations of the Workers' Compensation Act's statutory scheme that is designed to protect workers. *Raisl v. Elwood Industries, Inc.*, 134 Ill. App. 3d 170, 176, 479 N.E.2d 1106, 1110 (1985). We believe that the evidence supports the trial court's decision to submit Holland's punitive damages claim to the jury. Holland presented a *prima facie* case of willful and wanton conduct justifying a punitive damages claim.

¶ 246                                                         (b)
¶ 247                      Whether the Jury's Punitive Damages Award Is Excessive
¶ 248 Schwan's argues that even if the issue was properly submitted to the jury, the jury's award of $3.6 million in punitive damages is excessive both under the common law and under constitutional due process standards. Again, we disagree.

¶ 249                              (1)

¶ 250              Excessive Punitive Damages Under Common Law Standards

¶ 251       After the trial court determines that the plaintiff has made a *prima facie* case for punitive damages, the jury then decides whether to award punitive damages, and if so, in what amount. *Knecht v. Radiac Abrasives, Inc.*, 219 Ill. App. 3d 979, 983-84, 579 N.E.2d 1248, 1251 (1991). "The highly factual nature of the assessment of punitive damages dictates that a great amount of deference should be afforded the determination made at the trial court level, and to reflect that deference and the highly factual nature of the determination, we review the assessment of punitive damages on a manifest-weight-of-the-evidence standard." *Turner*, 363 Ill. App. 3d at 1161-62, 845 N.E.2d at 826. "A jury's assessment of punitive damages will not be reversed unless the manifest weight of the evidence shows that the assessment was so excessive that it demonstrated passion, partiality, or corruption on the part of the jury." *Id.* at 1162, 845 N.E.2d at 826. In determining the amount of punitive damages, the jury can consider the act itself as well as other circumstances including the motives of the wrongdoer, the relations between the parties, and the provocation or want of provocation for the act. *Statler v. Catalano*, 167 Ill. App. 3d 397, 406, 521 N.E.2d 565, 572 (1988).

¶ 252       In the present case, the jury's punitive damages award of $3.6 million is not against the manifest weight of the evidence. The jury awarded $660,400 in compensatory damages. The evidence presented at the trial included Schwan's balance sheet showing that its net worth was approximately $306 million. Accordingly, the jury's punitive damages award in the present case amounted to approximately 1% of Schwan's net worth. In *Howard v. Zack Co.*, 264 Ill. App. 3d 1012, 1028-29, 637 N.E.2d 1183, 1194-95 (1994), the court affirmed a punitive damages award in the amount of 5% of the net worth of the defendant, holding that the amount was not so large that it shocked the judicial conscience.

¶ 253       Likewise, in *Blount*, the court affirmed a punitive damages award in the amount of $2.8 million in a case where the jury awarded the plaintiff $282,350 in compensatory damages. The court noted that the punitive damages award was significantly more than the amount of compensatory damages. However, the court also noted that the jury had the unique ability to " 'articulate community values' " and evaluate " 'the reprehensibility of a defendant's conduct for the purposes of awarding punitive damages.' " *Blount*, 395 Ill. App. 3d at 23, 915 N.E.2d at 940 (quoting *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1144, 818 N.E.2d 357, 372 (2004)). In *Blount*, the court held that the punitive damages award was not excessive because the jury could have found the nature of the defendant's conduct to be egregious and because the amount represented roughly 3% of the defendant's net worth.

¶ 254       In the present case, the jury heard evidence that Schwan's engaged in conduct that the jury could find egregious and reprehensible. We cannot say that its award of punitive damages in the amount of roughly 1% of Schwan's net worth was the result of passion or prejudice on the part of the jury. *Id.* at 23, 915 N.E.2d at 940-41 (citing *O'Neill v. Gallant Insurance Co.*, 329 Ill. App. 3d 1166, 1185, 769 N.E.2d 100, 115-16 (2002) (upholding punitive damage award of 10% of the defendant's net worth for a breach of fiduciary duty), and *Howard*, 264 Ill. App. 3d at 1028, 637 N.E.2d at 1194-95).

¶ 255                                              (2)

¶ 256                        Excessive Punitive Damages Under Due Process Standards

¶ 257       The due process clause of the fourteenth amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor because such awards serve no legitimate purpose and constitute an arbitrary deprivation of property. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 417 (2003). The Court developed the following three guideposts (*Gore* analysis) to determine whether an award of punitive damages by a jury comports with due process: (1) the degree of reprehensibility of the conduct, (2) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages awarded, and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996). We use the *de novo* standard of review to analyze a jury's punitive damages award in light of these factors. *Blount*, 395 Ill. App. 3d at 24, 915 N.E.2d at 941.

¶ 258       The reprehensibility of the conduct is the most important factor, and that requires us to consider "whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 24-25, 915 N.E.2d at 941. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419.

¶ 259       In the present case, the harm caused by the retaliatory discharge included physical manifestations of psychological harm, including anxiety, distress, and sleeplessness. In addition, at the time of the retaliatory discharge, Holland was financially vulnerable, and the jury could have found that the retaliatory discharge was intentional and not a mere accident. The conduct of Schwan's agents and employees in handling Holland's workers' compensation claim evidence an intent on the part of Schwan's to deny him the protections afforded to him under the Workers' Compensation Act. The evidence of Schwan's flagrant disregard for an injured employee's statutory rights was sufficiently reprehensible and warranted a significant amount of punitive damages. The evidence, therefore, supports a finding by the jury that Schwan's acted with an intentional motive in retaliating against Holland.

¶ 260       The second factor of the *Gore* analysis concerns the ratio between the punitive damages and the actual harm sustained by the plaintiff. The Court has stated that a punitive damages award of more than a single-digit multiple of compensatory damages may be suspect in a due process analysis. *Campbell*, 538 U.S. at 425. In the present case, the jury awarded Holland $660,400 in compensatory damages. Therefore, the jury's punitive damages award was less than 5.5 times the award for compensatory damages. Under the facts of this case, we cannot hold that the ratio between punitive damages and compensatory damages is excessive. In *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d

456, 490, 870 N.E.2d 303, 324 (2006), the supreme court reduced a punitive damages award to "a double-digit ratio of approximately 11 to 1" and held that the reduced amount "would be reasonable and constitutional." See also *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (slightly more than a 7-to-1 ratio of $2.6 million punitive damage award to $360,000 compensatory damages award for employment discrimination was not unconstitutionally excessive); *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 535 (6th Cir. 2005) ($100,000 punitive damages award in wrongful termination suit found constitutional where it was nearly seven times the award for back pay); *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (37-to-1 ratio upheld); and *United States Equal Employment Opportunity Comm'n v. W&O, Inc.*, 213 F.3d 600, 616-17 (11th Cir. 2000) (a 26-to-1 ratio of punitive damages to compensatory damages as to one plaintiff and a ratio of 16 to 1 as to another plaintiff in a pregnancy discrimination case upheld because the awards "[were] reasonable in terms of the interest in deterring illegal discrimination"). In the present case, an approximate 5.5-to-1 ratio is well within the permissible range to further the interest in deterring retaliatory discharges.

¶ 261    The final factor in the *Gore* analysis is the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. In the present case, there are no civil penalties for the type of conduct for which Schwan's was held liable. Schwan's, however, argues that this factor weighs in favor of finding that the jury's punitive damages award of $3.6 million is excessive because punitive damages under a section 1981 retaliation claim under title VII are capped at $300,000. See *Blount*, 395 Ill. App. 3d at 30, 915 N.E.2d at 945-46 (citing 42 U.S.C. § 1981a(b) (2000)). In *Blount*, the court held that a punitive damages award of roughly $2.8 million was not a "huge discrepancy" from the $300,000 limit in title VII. *Id.* at 30, 915 N.E.2d at 946. Likewise, we do not believe a punitive damages award of $3.6 million is a "huge discrepancy" from title VII's $300,000 limit.

¶ 262    In addition, as noted above, the other two factors in the *Gore* analysis favor the jury's award. Where the other two factors favor the punitive damages award, the difference between title VII's punitive damages cap for analogous conduct is not enough, by itself, to establish that the jury's $3.6 million punitive damages award violates due process. *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) ("[A]lthough the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process.").

¶ 263    The legislature designed the Workers' Compensation Act to provide protection to injured workers (*Cassens Transport Co. v. Illinois Industrial Comm'n*, 218 Ill. 2d 519, 524, 844 N.E.2d 414, 419 (2006)), and punitive damages play a crucial role in protecting against violations of the Workers' Compensation Act's statutory scheme. *Raisl*, 134 Ill. App. 3d at 176, 479 N.E.2d at 1110. The evidence presented at the trial introduced the jury to an employer that intentionally worked an injured employee beyond his medical restrictions to the point that he suffered from severe pain from a work-related injury. When the employee's treating physician took him off work for recovery and treatment, it retaliated against the injured employee by terminating his employment. The need to deter employers from engaging in this type of reprehensible conduct is obvious and substantial. In light of the

evidence considered and weighed by the jury, we will not overturn its assessment of punitive damages as being excessive or unconstitutional. The jury's punitive damages award is, therefore, affirmed.

¶ 264                                    CONCLUSION

¶ 265    For the foregoing reasons, the judgment of the circuit court of Franklin County entered upon the jury's verdict is hereby affirmed.

¶ 266    Affirmed.

¶ 267    PRESIDING JUSTICE SPOMER, dissenting.

¶ 268    I respectfully dissent. As the majority notes, both before trial and at trial, one of the contested issues was whether the plaintiff was in fact discharged, or was simply demoted to a position in which he was not interested, leading to his voluntary resignation when he failed to report for duty in the new position. Conflicting testimony was adduced with regard to the plaintiff's job performance prior to the injury that led to his claim under the Act, as well as with regard to actions taken by Schwan's after the injury. In essence, the plaintiff attempted to demonstrate a "pattern of animus" toward him by Schwan's and its agents following his injury; Schwan's, on the other hand, attempted to portray the plaintiff as a poor performer both before and after his injury.

¶ 269    It is undisputed, however, that on May 20, 2009, as the plaintiff prepared to return to work after an absence related to his injury, a letter was sent by Daryl Overstreet, a human resources generalist at Schwan's, to the plaintiff informing him that based on his "performance" and his "record of unreliability," he was no longer qualified for the position of facility supervisor he had previously held, and that upon the plaintiff's "full duty release to work on May 25th, 2009," the plaintiff would "have a period of 30 days (5/25/09 to 6/23/09) to apply for other positions as they are posted." The letter also stated that if the plaintiff "should not find another position by [his] job elimination date, [his] employment will be terminated," and that he would then receive "any accrued and unused vacation, notification regarding [his] retirement plan account and [his] right to continue health insurance coverage under COBRA rules." The letter encouraged the plaintiff to "take advantage of the opportunity to pursue other employment opportunities within Schwan's Home Service, Inc. or another subsidiary of The Schwan Food Company" and encouraged the plaintiff to contact Overstreet if the plaintiff had "any further questions." Just beneath the plaintiff's name and address near the top of the letter, and just above the salutation line, was a subject line that stated: "RE: Position Reassignment." The plaintiff acknowledged that he received the letter on May 22, 2009.

¶ 270    The following facts are also undisputed: (1) the plaintiff was not to receive pay during the 30-day period referenced in the letter, as he was on what Overstreet termed, in deposition testimony, an "unpaid leave," (2) the plaintiff called Overstreet on the date the plaintiff received the letter, May 22, 2009, and was told by Overstreet that a material handler position

-50-

with Schwan's was available for the plaintiff, but that the plaintiff would have to apply for it and be accepted before he could return to work, and that the plaintiff should do this by contacting Gary Young about the position on May 25, 2009, (3) in a second conversation with Overstreet, on May 27, 2009, the plaintiff was again told to contact Young about the material handler position, (4) the plaintiff was sent, and received, a second letter from Schwan's, dated June 4, 2009, that stated that a "Material Handler I" position was immediately available for the plaintiff, that asked the plaintiff to "[p]lease contact your LGM, Gary Young, regarding this position and your return to work," and that advised the plaintiff that "failure to accept this position and return to work by June 23, 2009[,] may be considered your voluntary resignation and your employment may be terminated effective June 23, 2009," (5) the plaintiff was sent, and received, a third letter from Schwan's, dated July 1, 2009, that stated that it was "the final offer of employment," that "[t]he position remains available to you," and that "[f]ailure to accept this position and return to work by July 6, 2009[,] *will* be considered your voluntary resignation and your employment *will* be terminated effective July 6, 2009" (emphases in original), and (6) the plaintiff was sent, and received, a fourth letter from Schwan's, dated July 7, 2009, informing him that "[b]ecause you have failed to return to work, your termination of employment is effective today, July 7, 2009," and asking the plaintiff to return "any Schwan's property such as keys, wallet, beeper, etc." to Schwan's immediately.

¶ 271    With regard to why he did not apply for the material handler position that Overstreet told him about, the plaintiff testified at trial that based upon his experience with intracompany transfers at Schwan's, he did not believe it was "a legitimate offer," because if it had been, he believed he "would have received an internal formal offer from the company" in the form of a letter. He testified that based upon his training and experience in the past with Schwan's, he believed that the job would be posted on the Schwan's website; when he checked the website following his May 27, 2009, conversation with Overstreet, he found the job listed, but could not apply for it or get any details about it other than the job title. He then called Gary Young, who told him he was not "sure if the position really existed," but would call him back the next day. The plaintiff testified that on May 28, 2009, Young called him and told him that a material handler position did exist and was being offered only to the plaintiff. The plaintiff testified that because he did not receive an internal letter from the company regarding the position, because he "knew for a fact that there was no way that we were going to be able to employ another material handler," and because he could no longer "trust" Schwan's, he concluded that the offer from Schwan's of the material handler position was not "a legitimate offer." With regard to the June 4, 2009, letter from Schwan's, the plaintiff testified that the letter "actually reinforced" his belief that the material handler offer from Schwan's was "not a legitimate offer," because "[b]efore, I was told, you must apply for the position. You must be accepted by Schwan's and the location general manager. Now, all of a sudden, I get a letter that says, 'accept this position.' " He also testified that by the time he received the June 4, 2009, letter from Schwan's, he had no intention of applying "for further employment with Schwan's." On cross-examination, the plaintiff conceded that on May 27, 2009, when looking on the Schwan's website for the material handler position that Overstreet had mentioned to him, the plaintiff did not look to see if any other positions were available

for which he was qualified and could apply. He also conceded that he never made other efforts to determine if the material handler position was "legitimate" and never applied for the position or reported for it in response to the letters.

¶ 272    Multiple employees of Schwan's testified at trial about the May 20, 2009, letter and the circumstances surrounding it. Without exception, they testified that the plaintiff was demoted, not terminated, by the letter, and that it was only when he failed to report for work in the new position created for him that he was adjudged to have voluntarily resigned from Schwan's. With regard to whether the position created for the plaintiff was a legitimate one, Bonita Skuya, a workers' compensation specialist with Schwan's, testified that for Schwan's to offer someone a job, "there has to be a job." When asked by counsel for the plaintiff if it "has to be a real job," Skuya answered, "Yes." When asked by counsel whether Schwan's creates jobs "for which there are no work," Overstreet answered, "Absolutely not." Young testified that when the plaintiff failed to respond to the offer of the material handler position, no one else was hired to fill it, because, according to Young, the hours allocated for the position were "taken back because Larry didn't take the job."

¶ 273    At the close of the trial, Schwan's moved for a directed verdict, arguing that the plaintiff "was not fired," but was instead "offered another position that he declined." Schwan's had made the same argument in a motion for summary judgment prior to trial. That motion was denied, without explanation or analysis, in a docket entry by Judge Melissa Drew. The trial judge, Judge Vantrease, also denied the motion for a directed verdict. On appeal, Schwan's argues, *inter alia*, that the trial judge should have granted a directed verdict in favor of Schwan's and against the plaintiff. I agree and would reverse the order of the circuit court of Franklin County and remand with instructions to enter judgment in favor of Schwan's.

¶ 274    The majority is correct that our standard of review is quite deferential. As the Supreme Court of Illinois has recognized, "[u]nquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony." *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). Accordingly, a reviewing court "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Id.* at 452-53. To the contrary, a reviewing court must be mindful that a directed verdict is properly entered by the trial court only "in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand" (internal quotation marks omitted), and that when determining whether to enter a directed verdict, the trial court "does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Id.* at 453. A directed verdict may not be entered simply because the verdict of the jury is against the manifest weight of the evidence. *Id.* Moreover, the trial court may not enter a directed verdict "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* at 454.

¶ 275    With these principles, and the analysis put forth by the majority, in mind, I turn to the law governing the plaintiff's claim for retaliatory discharge, and the interplay of that law with the facts of this case. "As a general rule, Illinois follows the common law doctrine that at-will employment is terminable at any time for any or no cause." *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 151 (1999). However, in its 1978 opinion in *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978), the Supreme Court of Illinois recognized, for the first time, a cause of action for retaliatory discharge, thereby creating "a limited exception to an employer's ability to freely discharge an at-will employee." *Welsh*, 306 Ill. App. 3d at 151. To prevail on a claim for retaliatory discharge, a plaintiff must prove that the plaintiff was: "(1) discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 160 (1992). *Kelsay* established that being discharged for pursuing a claim under the Act violates a clear mandate of public policy and is actionable as a retaliatory discharge claim. *Kelsay*, 74 Ill. 2d at 181-85. "Discharge in an employment context is commonly understood to mean the release, dismissal, or termination of an employee." *Welsh*, 306 Ill. App. 3d at 153. In 2004, the Supreme Court of Illinois, in reviewing the history of the tort of retaliatory discharge, noted that "this court has consistently sought to restrict" the tort, and that the court had "*never* recognized a common law tort for any injury short of actual discharge." (Emphasis in original.) *Metzger v. DaRosa*, 209 Ill. 2d 30, 44 (2004) (citing *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29 (1994)).

¶ 276    For example, in *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 151 (1992), the plaintiff, who had been injured on the job and had pursued a claim under the Act, sought injunctive relief against his employer, Illinois Power, alleging that because Illinois Power had directed him to begin a job search, it had, in effect, " 'started the process of retaliatory discharge.' " The Illinois Supreme Court held that injunctive relief was not available to the plaintiff, because he could not demonstrate the existence of a clearly ascertainable right not to be discharged in retaliation for filing a claim under the Act. *Id.* at 160. The *Hartlein* court adjudged the plaintiff's " 'right' to be free from a retaliatory discharge" to be "doubtful." *Id.* As the court put it, "[q]uite simply, [the plaintiff] was not discharged by Illinois Power when the company told him to contact other potential employers, nor was evidence offered to rebut *** testimony that Illinois Power had no intention of discharging Hartlein." *Id.* at 161. The court noted that "[w]hile the proposed job search might have eventually resulted in an end to Hartlein's employment relationship with Illinois Power, either voluntarily or involuntarily, the directive to search, in the context of these facts, does not constitute discharge." *Id.* The court then held that "with regard to the fact of discharge, we decline to expand the tort to encompass a retaliatory discharge 'process' as alleged by Hartlein." *Id.* The court reasoned that the appellate court might have been correct in stating that directing Hartlein to look for a job elsewhere was " 'patently inconsistent' " with Hartlein's continued employment at Illinois Power, but that "[n]onetheless, a directive to start a job search, particularly, as part of a program of vocational rehabilitation, is not the equivalent of involuntary discharge." *Id.* at 162. The court also declined "to expand the tort of retaliatory discharge, on these facts, to encompass the concept of 'constructive discharge.' " *Id.* at 163.

¶ 277    In *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29 (1994), the Illinois Supreme

Court revisited the element of discharge in a retaliatory discharge action. After reiterating the holding in *Hartlein* that the tort of retaliatory discharge does not "encompass a retaliatory discharge 'process' " (*id.* at 37), the court noted that the present plaintiff wanted the court "to extend the existing law to circumstances in which an employee suffers a loss of employment status or income or both, but is not terminated from *** employment altogether." *Id.* at 38-39. The court declined to "extrapolate from the rationale of *Kelsay* a cause of action predicated on retaliatory demotion," reasoning that to do so "would replace the well-developed element of discharge with a new, ill-defined, and potentially all-encompassing concept of retaliatory conduct or discrimination" that would force Illinois courts "to become increasingly involved in the resolution of workplace disputes which center on employer conduct that heretofore has not been actionable at common law or by statute." *Id.* at 39. The court could find no "compelling reason for expanding judicial oversight of the workplace to include review of demotions, transfers, or other adverse work conditions that are alleged to be retaliatory in nature." *Id.* Turning specifically to the Act, the court held that the General Assembly could "expressly amend the Act if it determines that a damages remedy should be available for persons who claim a diminution of their employment based on a theory of retaliatory conduct." *Id.* at 44.

¶ 278    Against this backdrop, I turn to the evidence adduced in the case at bar. As noted above, Schwan's has contested, since the outset of this case, whether the plaintiff was in fact discharged, or was simply demoted to a position in which he was not interested, leading to his voluntary resignation when he failed to report for duty in the new position. The plaintiff, on the other hand, has consistently contended, both in the trial court and on appeal, that the May 20 letter discharged the plaintiff, and that "the facts supporting the jury's awards of compensatory and punitive damages *** demonstrate that the trial court did not" err in denying the motion for a directed verdict. As explained above, the question before this court is whether all of the evidence presented to the jury regarding the element of discharge (which, as also explained above, is commonly understood in an employment context to mean the release, dismissal, or termination of an employee), when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favors Schwan's that no contrary verdict based on that evidence could ever stand. In other words, this court must determine whether *any* evidence supports the plaintiff's position that he was terminated by the May 20 letter.

¶ 279    I begin by noting that the objective evidence presented to the jury–which is detailed above, and which includes the wording of the letter itself, the testimony of the plaintiff and various Schwan's employees about factual events before and after the mailing of the letter, and subsequent letters from Schwan's–provides no support for the plaintiff's argument that he was terminated by the letter. Even when viewed in the light most favorable to the plaintiff, the evidence demonstrates, at the most, that Schwan's had begun a job reassignment process that might eventually lead to the termination of the plaintiff, if he did not follow the directions in the letter and the directions he received verbally from Overstreet. However, as noted above, the Supreme Court of Illinois has "*never* recognized a common law tort for any injury short of actual discharge." (Emphasis in original.) *Metzger v. DaRosa*, 209 Ill. 2d 30, 44 (2004) (citing *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29 (1994)). Until today, no published opinion of this court or the Supreme Court of Illinois has recognized a valid

cause of action for retaliatory discharge in a situation such as the one in the case at bar.

¶ 280　　I recognize that in the case of *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142 (1992)–the case in which the Supreme Court of Illinois expressly rejected the recognition of a *process* of retaliatory discharge–the plaintiff had not yet suffered a loss of income, whereas in the case at bar, it is undisputed that the plaintiff was not to receive pay during the 30-day period referenced in the May 20 letter, as he was on what Overstreet termed, in deposition testimony, an "unpaid leave." However, the plaintiff had the power to end his unpaid leave at any time, including on the day it began, May 25, 2009, by following Overstreet's instructions to contact Young on that date to apply for the material handler position that Overstreet had told the plaintiff on May 22, 2009, that Schwan's had created for him. Had the plaintiff contacted Young on May 25, 2009, as Overstreet instructed him to do, and been told unequivocally by Young or another agent of Schwan's that the material handler position did not exist, or that the plaintiff's services were no longer desired by Schwan's, or even that he could not begin work in the new position immediately despite his desire to do so, there would be at least *some* evidence from which a jury could have determined that the May 20 letter was in fact a termination letter that discharged the plaintiff from his employment with Schwan's. However, the plaintiff disregarded the verbal instructions of Overstreet to apply for the position, and the instructions in the letter to apply for other positions, and therefore it was the plaintiff, and the plaintiff alone, who was responsible for remaining in unpaid status on May 25, 2009. Indeed, the plaintiff took no further action until May 27, 2009, when, following a second conversation with Overstreet, he contacted Young, who told the plaintiff that he was not "sure if the position really existed." When the legitimacy of the position was confirmed for him the following day, May 28, 2009, the plaintiff still took no steps to apply for it. In fact, the plaintiff never applied for the position or for any other open positions with Schwan's. Again, had he done so, only to be told that the positions were not legitimate, or that his services were no longer desired by Schwan's, or even that he could not begin work in a new position immediately despite his desire to do so, there would be at least *some* evidence from which a jury could have determined that the May 20 letter was in fact a termination letter that discharged the plaintiff from his employment with Schwan's. He did not,[4] and, put simply, the jury was presented with no objective evidence from which it could

_____

[4]Even if this court were to assume, *arguendo*, that the plaintiff indicated to Young on May 27, 2009, that he wished to end his unpaid leave immediately by applying for the material handler position–an assumption that I note is not supported by testimony from the plaintiff or anyone else–and that therefore he was in unpaid status against his will for approximately 24 hours while awaiting confirmation from Young that the position really existed, I would not find a mere 24-hour involuntary unpaid leave to be evidence from which a jury could have concluded that the plaintiff was terminated by the May 20 letter. In *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 38-39 (1994), the Supreme Court of Illinois declined the invitation of the plaintiff in that case "to extend the existing law to circumstances in which an employee suffers a loss of employment status or income or both, but is not terminated from *** employment altogether." As the *Zimmerman* court noted, if the General Assembly wished to expand the tort of retaliatory discharge beyond its present confines, that body could "expressly amend the Act if it determines that a damages remedy should be available for persons who claim a diminution of their employment based on a theory of retaliatory

have concluded that Schwan's, rather than the plaintiff, ended the plaintiff's employment with Schwan's.

¶ 281    Nor does the plaintiff's testimony about his subjective belief that he was terminated by the May 20 letter provide evidence of discharge. In *Horton v. Allstate Insurance Co.*, 125 Ill. App. 3d 1034, 1038 (1984), the appellate court held, in the context of a motion for summary judgment, that the mere subjective belief of a plaintiff did not provide "any evidence from which a jury could conclude" that the defendant had committed an anticipatory breach of an insurance contract. To the contrary, the objective evidence presented demonstrated that the defendant insurance company had merely requested additional information from the plaintiff before agreeing to pay his claim, and the plaintiff's subjectively formed "anticipatory breach" theory had no basis in reality. *Id.* Likewise, in the case at bar, the plaintiff's testimony about his subjective belief that he was terminated by the May 20 letter, because in his opinion the material handler position was not "legitimate," does not provide any basis from which the jury could have concluded that the letter terminated the plaintiff, rather than, at most, began a job reassignment process that might have led to the plaintiff's termination. See also *Florsheim v. Travelers Indemnity Co. of Illinois*, 75 Ill. App. 3d 298, 306, 307 (1979) (plaintiff's subjective belief about facts and legal consequences stemming therefrom insufficient to defeat summary judgment and create question of fact for jury).

¶ 282    In the case at bar, under all existing case law, the motion for a directed verdict should have been granted. Moreover, I note an additional error by Judge Vantrease that would require us to reverse the order of the trial court, albeit to remand for a new trial, rather than to enter judgment in favor of Schwan's: although the comments to the pattern jury instruction detailing what the plaintiff had to prove to prevail on his theory of retaliatory discharge–Illinois Pattern Jury Instructions, Civil, No. 250.02 (2011)–state that the instruction "is to be modified *** if there is an issue of whether the plaintiff was actually discharged," Judge Vantrease, without explanation, denied Schwan's proposed instruction No. 3, which would have modified the instruction and informed the jury that if the plaintiff "was demoted or constructively discharged, he has no cause of action for retaliatory discharge. If you determine that [the plaintiff] was not terminated but was legitimately reassigned to another position, even if that position was created just for him, you must find in favor of defendant." As a result of the judge's decision, the jury was never instructed on a key aspect of the law regarding the tort of retaliatory discharge: that anything short of actual discharge is not, and has never been, actionable under Illinois law. Instead, the jury was given only the unmodified instruction, which, by its own terms, is not appropriate for a situation where the element of discharge is disputed and more explicit jury instructions are required.

¶ 283    For these reasons, I would reverse the order of the circuit court of Franklin County and remand with instructions to enter judgment in favor of Schwan's. Because the majority decline to do so, I respectfully dissent from their disposition of this appeal.

conduct." *Id.* at 44.